# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CA-01447-SCT

*COHO RESOURCES, INC. AND GARY COCKRELL*

*v.*

*LUTHER McCARTHY, ADMINISTRATOR OF THE ESTATE OF KELVIN DALE McCARTHY, DECEASED; AND BOBBY STROO AND WIFE, PATTI STROO*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/14/1997 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | JASPER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | BRENDA B. BETHANY |
| | C. MICHAEL ELLINGBURG |
| ATTORNEYS FOR APPELLEES: | JAMES W. NOBLES, JR. |
| | TRAVIS T. VANCE, JR. |
| | THOMAS L. TULLOS |
| | PAUL BRYANT CASTON |
| | JOHN M. DEAKLE |
| | JOHN MICHAEL SIMS |
| | WILLIAM R. COUCH |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART- 06/27/2002 |
| MOTION FOR REHEARING FILED: | 7/26/2002; denied 10/31/2002 |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, JUSTICE, FOR THE COURT:**

¶1. Kelvin Dale McCarthy was killed and Bobby Stroo was injured while performing a workover on an oil well in the Soso oil and gas field in Jasper County, Mississippi. Coho Resources, Inc., the operator of the

well, had hired Smith Brothers, Inc., an independent contractor, to perform the workover. McCarthy and Stroo were part of the crew employed by Smith Brothers who operated Rig No. 15, the rig that was working over the well where the accident occurred. The administrator of McCarthy's estate filed a wrongful death action against Coho and Gary Cockrell. Cockrell was Coho's "company man"[1] who was working at the job site the day of the accident. In another suit, Bobby and Patti Stroo filed an action against the same defendants for personal injuries he sustained and loss of consortium suffered by his wife, Patti Stroo. Both suits were filed in the Circuit Court of the First Judicial District of Jasper County. Smith Brothers was not a party to either action because of the exclusivity of the workers' compensation laws. Glenn Ainsworth was later added as a party defendant, pursuant to Rule 15 of the Mississippi Rules of Civil Procedure. Ainsworth, an independent consultant retained by Coho, was the "company man" during the first days of the workover before he was later replaced by Cockrell.

¶2. Prior to the trial, the two actions were consolidated into one. A few days before the trial commenced, Ainsworth was severed from the case. After the trial, the jury awarded McCarthy's estate $3,500,000, Bobby Stroo $1,500,000, and Patti Stroo $10,000. Coho and Cockrell filed motions with the court for JNOV, for a new trial, and for remittitur of the jury's verdict. The administrator of McCarthy's estate and the Stroos filed motions to assess prejudgment interest. The trial court denied the motion for JNOV, finding there was substantial evidence to support the jury verdict. The court further denied the motion for a new trial, finding there were "no errors in the admission or exclusion of evidence, or the jury instructions given or refused, or other matters which were the subject of objection, and motions for mistrial, which affected the outcome of the case in any material way or affected the defendants' right to a fair trial." However, the trial court found the verdicts in favor of McCarthy and Bobby Stroo so large that they "were the product of bias, passion and prejudice on the part of the jury and shocked the conscience of the court," and ordered McCarthy's award reduced to $2,750,000 and Bobby Stroo's award reduced to $840,000. The trial court also awarded McCarthy's estate, Bobby Stroo and Patti Stroo prejudgment interest at rate of eight percent per annum. These amounts were further reduced to an aggregate amount of $2,000,000, between McCarthy and the Stroos, based on a settlement agreement reached with Coho and Cockrell's excess liability insurers during the trial. Aggrieved, Coho and Cockrell appeal, asserting the following 10 assignments of error, edited for brevity:

**I. DENIAL OF MOTIONS FOR DIRECTED VERDICT AND JNOV.**

**II. ALLOWING DR. HAMMITT TO OFFER EXPERT TESTIMONY ABOUT SOIL CONDITIONS AND CAUSATION.**

**III. REFUSING TO ALLOW EVIDENCE OF SUBSEQUENT REMEDIAL MEASURES.**

**IV. PREJUDICIAL STATEMENTS MADE BY PLAINTIFFS' COUNSEL.**

**V. REFUSING TO ALLOW EVIDENCE OF WORKERS' COMPENSATION AND SOCIAL SECURITY BENEFITS.**

**VI. AWARDING PREJUDGMENT INTEREST.**

**VII. AWARD TO PATTI STROO FOR LOSS OF CONSORTIUM.**

**VIII. ERRORS IN CHARGING THE JURY; GRANTING SOME JURY INSTRUCTIONS WHILE DENYING OTHERS.**

**IX. ALLOWING INTRODUCTION OF EVIDENCE CONCERNING INSURANCE.**

**X. SEVERING GLENN AINSWORTH FROM THE CASE.**

¶3. Coho and Cockrell argue that they are entitled to a JNOV on assignments of error I & VII, and that this Court should reverse and render on those issues. On the remaining issues, they argue that each is reversible error; therefore, this Court should reverse and remand to the trial court for a new trial. Concluding that assignments of error VI and VII have merit, we reverse and render on those issues. On all other issues we affirm the judgment of the trial court.

## FACTS

¶4. In 1990, Coho became the owner and operator of the existing oil and gas wells in the Soso oil and gas field in Jasper County, Mississippi. As owner and operator, Coho had the right to develop and produce the subsurface oil and gas, but did not own the surface rights. At the time that Coho took over, many of the wells had been previously taken out of production or "shut-in." Coho hired Smith Brothers to perform the workovers, reopening and restoring production in previously shut-in wells. Smith Brothers had been in the workover business for over a decade and had performed hundreds of such procedures, including over 50 in the Soso field alone.

¶5. Although Smith Brothers had performed workovers for Coho for several years prior to the accident, it was not until August 1995 that they formalized their business relationship into a written contract. The contract states in relevant parts:

II(C) By submitting a bid, the CONTRACTOR acknowledges that he has studied and understands the job, knows the materials and conditions affecting the work and agrees to all provisions of Coho standard work contract.

II(D) CONTRACTOR shall enforce all safety practices throughout the period as designated on bid and shall use the utmost caution to guard against damage to life and property . . . .

III(C) . . . the CONTRACTOR shall promptly remove and replace any employee at any time such employee proves unsatisfactory to the COMPANY'S representative.

III(D) All personnel furnished by the CONTRACTOR are sole employees of the CONTRACTOR and shall not be considered the employees of the COMPANY.

V(A) . . . CONTRACTOR shall, at CONTRACTOR'S sole cost and expense, furnish supervision, labor, equipment, machinery, tools, materials and supplies necessary for the performance of the work herein contemplated in a diligent, good and workmanlike manner . . . CONTRACTOR further covenants, warrants and represents that it is an expert in the work performed, that its employees . . . are suitably trained to safely perform the work and that all work performed hereunder shall be conducted safely. . . . **COMPANY reserves the right of dismissal of CONTRACTOR'S personnel or termination of contract if a complete safety program is not followed**, or from deviation from the following: . . .

VII. At all times during the term of this Agreement, CONTRACTOR, shall maintain insurance policies

described below . . .

(A). <u>Workers' Compensation Insurance</u> in accordance with the laws of the State in which the work is performed, and <u>Employer's Liability Insurance</u> within minimum limits of $1,000,000.

X. **CONTRACTOR shall be an independent contractor** with respect to the performance of all work and service hereunder, and neither CONTRACTOR nor anyone employed by CONTRACTOR, shall be deemed for any purpose to be the employee, agent, servant or representative of COMPANY in the performance of any work or service hereunder. **COMPANY shall have no direction or control of CONTRACTOR or its employees**, agents, representatives and subcontractors except in the results to be obtained. The work contemplated herein shall meet the approval of the COMPANY and be subject to the general right of inspection of COMPANY to secure the satisfactory completion thereof. **The actual performance and superintendence of work contemplated herein shall be by CONTRACTOR, but COMPANY or its representatives shall have reasonable access to the operations** . . .

XV. This Contract shall be construed and enforced in accordance with the laws of the State of Mississippi.

(emphasis added).

¶6. Pursuant to the contract, Smith Brothers agreed to provide its own equipment. This equipment included the workover rig and the other equipment necessary to install and remove the workover pipes from the well. Coho claims that it did not retain or exercise control over the employees of Smith Brothers, nor did it determine the manner or means by which the rig crew performed the work. However, Coho provided Smith Brothers with a step-by-step procedure that it had to follow in completing the workover.

¶7. For this particular workover where the accident occurred, Smith Brothers' workover crew consisted of David Langley - the toolpusher ( rig supervisor); Lee Mosely - the relief toolpusher; Kelvin McCarthy - the derrickman; Bobby Stroo - the driller; and Columbus Bunch and Joey Langley - the floor hands. All were employed by Smith Brothers.

¶8. The well on which the accident occurred had been originally drilled in 1965. In accordance with industry practices, the original drilling rig would be removed, and the well would be completed using a truck mounted workover rig, like the one used by the Smith Brothers in performing its workover. Since its original completion, the well had been worked over at least three previous times with truck mounted workover rigs, evidently without incident. Further, both tool pushers, Langley and Mosely, had performed several workovers in the Soso field, including the workover of some wells less than one-quarter mile from the well involved in the present case. Both testified that normally they perform no additional site preparation on a workover site, because that would have been done when the well was originally drilled.

¶9. The purpose of the workover job was to clean out the cast-iron bridge plug and to clean out the bottom of the hole. Smith Brothers set up their rig at the well site on November 15, 1995, and until December 5 of that same year the workover operation proceeded without incident. One of the procedures performed during workovers is referred to "pulling out of the hole." During the workover, the crew uses a string of pipes (several individual pipes screwed together) with a drill bit (or other tool) on the end of it, to drill out old plugs in the well bore. When the crew needs to change or inspect the drill bit, the workover crew uses

the rig to pull the pipe out of the well. As the string of pipe is pulled out, the crew disconnects each pipe and stands it on a wooden mat on the ground, then leans the top of the pipe against the racking board on the derrick. This operation involves tens of thousands of pounds of pipe being stacked vertically on the wooden mat and leaned against the derrick. This crew had performed this particular procedure at this well three times before December 5 without a problem. However, each successive "pulling out of the hole" involves more pipe being stacked on the wooden mat, thus more weight, as the workover work goes deeper and deeper into the well.

¶10. It rained during the day of December 5, and continued raining on the 6th, the day the accident occurred. On December 5, the crew began "pulling out of the hole" for the fourth time, but had only removed approximately 30 strands of pipe before they broke for the day. The next day they continued the procedure. A short time before the rig fell over, Langley, the tool pusher, had notified Cockrell that the racking board was sinking. Cockrell stayed in his truck and did not check out the situation. Instead, he relied upon Langley's assurance that it was nothing to be concerned about. Around thirty minutes before the rig turned over, the derrickman, McCarthy, told Stroo (the driller) that he thought that the derrick was leaning. Stroo testified that he performed a test that indicated that the derrick was plumb, and decided to proceed. Langley checked the site and rig approximately twenty minutes before the accident. At the time the workover rig and derrick fell over, killing McCarthy and injuring Stroo, there were 236 strands of pipe racked at the derrick, with an estimated weight of 135,000 pounds. Cockrell, Coho's representative, was at the site waiting in his truck for the crew to complete the procedure so he could inspect the drill bit.

¶11. McCarthy and Stroo were both employees of Smith Brothers at the time of the accident, and Smith Brothers, as required by its contract with Coho, carried Mississippi workers' compensation insurance. Coho and Cockrell argue that McCarthy's estate and Stroo, individually, have been fully compensated under the workers' compensation laws.

## STANDARD OF REVIEW

¶12. The standards of review for a denial of a directed verdict and JNOV are identical. This Court has stated that:

> Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

*GMAC v. Baymon*, 732 So.2d 262, 268 (Miss. 1999).

## DISCUSSION

## I. DENIAL OF MOTIONS FOR DIRECTED VERDICT AND JNOV.

¶13. Coho and Cockrell argue that they are entitled to have the final judgment of the trial court reversed and rendered because, as a matter of law, they are not liable for the death and injuries of the employees of Smith Brothers. They assert three different arguments that each lead to that same conclusion: (A) Coho and

Cockrell were not the owners of the premises; (B) even if they were the owners, they would not have liability for death or injuries because there is no duty to protect an independent contractor against risks arising from or intimately connected with the work, and there is no liability for death or injury resulting from dangers that the contractor, as an expert, knows or reasonably should know; and (C) there was no duty to perform a soil test or site preparation work. We will examine each of their arguments in turn.

### (A) Neither Coho Nor Cockrell Owned the Premises.

¶14. Coho and Cockrell argue that there is no proof that they owned the site, and, in fact, all the proof is that they did not. Coho and Cockrell further argue that *Jones v. James Reeves Contractors, Inc*., 701 So.2d 774 (Miss. 1997), is the controlling law in this case.

¶15. In *Jones*, the heirs and estate administrator of a construction worker sued, inter alia, Howard Industries, the lessee of the property, after the worker was killed when the walls of a ditch being excavated for a sewer line caved in. *Id.* at 775. The trial court judge granted summary judgment in favor of Howard Industries concluding that it had not breached a duty to the deceased worker. *Id.* On appeal, this Court agreed and affirmed the trial court's decision. *Id.* However, Howard Industries was in a completely different position than Coho in that Jones County was the owner of the site and was responsible for constructing the building. *Id.* Howard Industries as the lessee was only the authorized agent of Jones County for the purpose of completing the construction site. *Id.* Since Howard Industries was merely the agent of Jones County, "it incur[red] no liability in acting on its principal's contracts." *Id.* at 782.

¶16. In the case sub judice, while Coho was the lessee and not the owner of the land, it clearly was the owner of the well, and it admitted so on several occasions. First, in its answer to McCarthy's original complaint it states: "the Defendants admit that Coho owned the oil well known as SOSO Field Unit #2831-Z8 and that the oil well was being worked over by Smith Brothers Well Service." Second, while Cockrell, Coho's company man, was being cross-examined, he admitted that Coho owned the well in the exchange that follows:

Q. Okay. Now did Coho own that well on December 6, 1995?

A. Yes.

Q. Did they own that well on November 15, 1995, when the Smith Brothers' workover rig was pulled back on to the well site by a wrecker?

A. They owned it then, yes, sir.

¶17. Finally, Coho and Cockrell requested and were granted Jury Instruction D-15, which states in the first paragraph: "You are instructed that Smith Brothers, Inc. was acting as an independent contractor of Defendant Coho Resources, Inc., the owner of the well site, at the time of the accident of December 6, 1995."

¶18. While it is true that Coho did not own the pasture land around the well, Coho clearly was the owner of the well. Further, "[u]nder Mississippi law it is established that a working interest in an oil well is realty." *Chevron Oil Co. v. Clark*, 432 F.2d 280, 286 (5th Cir. 1970)(citing *Merrill Eng'g Co. v. Capitol Nat'l Bank of Jackson,* 192 Miss. 378, 5 So.2d 666 (1942)). *See also Nash v. Damson Oil Corp.*, 480 So.2d 1095 (Miss. 1985). However, a federal district court, interpreting Mississippi law, has also said

that an owner of an interest in realty is not necessarily an owner of realty so as to give rise to liability for injuries occurring thereon. *Bolivar v. R & H Oil & Gas Co.*, 789 F. Supp. 1374, 1384 (S.D. Miss. 1991). In *Bolivar*, a wrongful death action was filed against the owners of working interests in a natural gas well and against the operator of the well. *Id.* at 1375. The district court held that one of the defendants, Henry Burns, who was merely a non-consenting working interest owner, could not be held liable for any injuries under any theory of recovery, including negligence as a premise owner. *Id.* at 1384. What was critical to the district court was the fact that Burns, a non-consenting working interest owner, had never in any manner participated in or attempted to control the performance of any work at the well. *Id.*

¶19. As will be further discussed, infra, Coho's attempt to portray itself as a passive part-owner of mineral rights, as did Henry Burns, is not convincing. Coho had exclusive operating rights of this particular oil well, and had ultimate control over Smith Brothers who it had hired to perform the workover at the well. This issue is without merit.

### (B) Even If Coho was Treated as an Owner of the Site, It Would Not Have Liability for the Injuries and Death of Smith Brothers Employees.

¶20. Coho and Cockrell argue that even assuming, arguendo, it was treated as the owner, it would still not be liable for the death and injuries of its independent contractor. While the owner of a premises, under Mississippi law, generally has a duty to use reasonable care to keep its premises in a reasonably safe condition for business invitees, the owner is not an insurer of the invitee's safety. *Jones*, 701 So.2d at 782. Coho and Cockrell claim they have no duty to protect an independent contractor against risks arising from or intimately connected with the work, or for conditions about which the independent contractor should have known.

### (1) No duty exists to protect an independent contractor against risks arising from or intimately connected with the work.

¶21. Coho and Cockrell argue that even though the causation of the accident is in dispute, it is undisputed that the injury and death occurred when a workover rig fell while Smith Brothers, the independent contractor, was performing an aspect of its work over which it had exclusive control. Further, all of the witnesses testified that the entire operation of setting up the rig, leveling it on the foundation beam, stabilizing it with guy wires, and all other protective measures, were under the exclusive control and direction of Smith Brothers. In *Jones*, this Court held:

> Where a party . . . contracts with another . . . to perform original construction or repair work . . . and devolves upon the contractor the right and fact of control of the premises and the nature and details of the work, the owner has no liabilities for injuries experienced by the contractor's workers where those injuries arose out of or were intimately connected with the work.

*Id.* (quoting *Magee v. Transcon. Gas Pipe Line Corp*., 551 So.2d 182, 185 (Miss. 1989)).

¶22. In *Magee,* the administratrix of the estate of a welder injured on a natural gas pipe laying project, filed a negligence action against the owner of the pipeline and the construction company building it. *Magee*, 551 So.2d at 183. The circuit court granted summary judgment to both defendants, and this Court unanimously affirmed. *Id.* at 184. Magee, the welder, was employed by Singley, the construction company, which in turn had been hired by Transco, the pipeline owner, as an independent contractor to perform the pipeline

construction. *Id.* Singley's dismissal was upheld because Magee was an employee of Singley; thus, workers' compensation was the exclusive remedy. *Id.* at 187. Transco's dismissal was upheld because the de jure and de facto control of the pipe laying process had been lawfully vested in the contractor. *Id.* at 185. Pursuant to the contract, Singley assumed full and complete responsibility for the conditions pertaining to the work, the site of the work, and all conditions therewith. *Id.* at 184. Further, Singley assumed responsibility for the care and maintenance of the work until completed and accepted by Transco. *Id.* at 185. Singley also exercised de facto control over the safety of the work-site, had control over the manner of construction of the pipeline, furnished all of the tools employed in the process, and provided all of the employees for the project. *Id.* Singley maintained complete control over the methods and manner in which the pipeline was constructed, the details of the construction, the payment of the employees, and work-site safety. *Id.* Although Transco had an on-site pipeline inspector (company man), he would merely periodically inspect the work of the Singley employees. *Id.* In concluding that Transco had no liability for an injury incurred by a Singley employee, this Court said:

> What is critical is whether the project owner **maintains any right of control over the performance of that aspect of the work that has given rise to the injury**. . . . In this setting the undisputed language of the contract becomes important. . . . That is not to say that in cases like this the plaintiff may never win. If he can show that, the contract notwithstanding, **the owner maintained substantial de facto control** over those features of the work out of which the injury arose, we may have a horse of a different color.

*Id.* at 186 (emphasis added).

¶23. In the case sub judice, under the contract between Coho and Smith Brothers, Smith Brothers assumed full and complete responsibility for the conditions pertaining to the work, the site of the work, and responsibility for the care and maintenance of the work. The contract clearly stated that Smith Brothers was an independent contractor, and Coho had no direction or control over Smith Brothers or its employees. As was the arrangement in *Magee*, Coho retained the right to reasonable access to the work-site. However, Coho further reserved the right of dismissal of Smith Brothers' personnel or termination of contract if a complete safety program was not followed. Although the de jure control of the workover had been vested in Smith Brothers in one part of the contract, in another part, clearly Coho retained the ultimate authority for safety.

¶24. Similarly, testimony at trial indicated that Coho retained substantial de facto control. McCarthy and the Stroos argue that Smith Brothers' crew had to follow the orders of Coho and its company man on the site. Further, Coho provided Smith Brothers with a step-by-step procedure that it had to follow in completing the workover. Finally, the contract specified a "day rate" or hourly rate for the work. This type contract stands in contrast to a "turnkey" contract, under which the driller or well service company bids for a price paid by the operator to deliver a completed well, and is solely responsible for the job -- good, bad or indifferent -- and everything that happens to it. Smith Brothers' crew was required to follow Coho's procedure, under the supervision of Coho's company man who exercised control over the down hole operations and any related work. This necessarily included the operation which was taking place at the time of the accident. Smith Brothers' crew was following Cockrell's order to continue pulling pipe until all of the pipe was pulled before the end of the day, the duration of which was determined by Coho and Cockrell. As previously stated, when Cockrell was asked what his job title was, he replied, "workover and completion foreman."

¶25. Other testimony at trial confirms these assertions. Coho admitted that it directly supervised the down hole operation. Further, when Cockrell, the company man, was being cross-examined concerning the workover plan, prepared by Coho, that Smith Brothers followed, this exchange took place:

Q. Well, they had to follow that step by step procedure there, didn't they?

A. They had to - - we have to have a beginning point and we have an end result and these are the steps in between and we try to get to that point.

Q. And who is we?

A. The - - prognosis is written by Coho and this work and each step is carried out and is carried out [sic] by Smith Brothers and I don't - - don't physically go out there and do any of that work myself. That's the Smith Brothers' crew and they are responsible for the safety and the operation of that rig **while they are doing what we direct them to do** from this prognosis.

(emphasis added).

¶26. When Ainsworth, the other company man, was being cross-examined, he admitted that Coho had the ultimate control over the workover: "I do have control over what - - when they stop and start." He further admitted he was the "boss" over the workover site:

Q. You can stop that rig and shut it down in the face of the tool pusher's objection if you deem it necessary for safety, can't you?

A. Yes, sir, I could.

. . .

Q. Because one more time, you are the boss?

A. Yes, sir.

Ainsworth also further admitted:

Q. Okay. Then I'll rephrase my question and ask you that you or whichever company man is out there that day is the boss no ifs, ands, or buts about it?

. . .

Q. Do you understand that question?

A. Yes, sir.

Q. Okay. And that's the truth, isn't it? That's what you are out there for, isn't it?

A. Yes, sir.

Q. So, there's no question about that?

A. No, sir.

Q. Okay. You can make them stop any time you want to if you feel that's necessary?

A. Yes, sir, if I feel it's necessary.

. . .

Q. You can make them work any time you want to if you think that's necessary?

A. Yes, sir.

¶27. Bobby Stroo's testimony also indicates that the ultimate control of the workover site was in the hands of the company man, who was on the job site 75-85% of the time:

Well, the company man, first of all, he don't tell me nothing. He goes to my tool pusher. My tool pusher tells me. I tell the crew that's under me. That's all work in the chain of command. Anything that I got to ask. I don't go to the company man and ask. I go to my tool pusher. My tool pusher goes to the company man. The company man goes to call whoever he's got to call.

¶28. When B.J. Smith, an employee of Smith Brothers, was asked whether Coho's company man has the right to terminate his personnel for any reason, he responded, "He could - - he could stop operation of the rig and lay the rig off."

¶29. Although an owner is not liable for injuries sustained by an employee of an independent contractor, caused by the negligence of such independent contractor, an owner is liable to employees of an independent contractor for his own negligence. *Mississippi Power Co. v. Brooks,* 309 So. 2d 863, 866 (Miss. 1975). In *Anderson v. Hensley-Schmidt, Inc.,* 530 So.2d 181, 183 (Miss. 1988), this Court discussed the duty of one bound by contract to provide proper supervision. After two workers were electrocuted while erecting a concrete utility pole near power lines, Hensley-Schmidt, the consulting engineering firm engaged by the City of Greenwood, was sued for negligent supervision. This Court held:

. . . Hensley-Schmidt had a contractual duty to oversee the construction in progress for safety, and had the authority to stop any work not being performed in a safe manner. The jury would have been justified in finding, therefore, that Hensley-Schmidt was either negligent in failing to recognize its responsibility, or recognizing it, failed to specifically instruct its employee . . . .

*Id.* at 184. McCarthy correctly asserts that Cockrell and Coho similarly had the authority to stop any work not being performed safely. Testimony demonstrated that Coho did retain and exercise substantial control over Smith Brothers' work, and directly supervised the down hole operation. In short, what we have here is a "horse of a different color." See *Magee,* 551 So. 2d at 186. A short time before the rig fell over, Langley had notified Cockrell that the racking board was sinking. This presents a jury question, and a jury could reasonably find Coho and Cockrell negligent for either failing to recognize their responsibility, or recognizing it but failing to specifically instruct the workers.

¶30. While the general rule is that the owner of the premises does not have a duty to protect an independent contractor against risks arising from or intimately connected with the work, there is an exception where the owner maintains substantial de jure or de facto control over the work to be performed. The contract and testimony at trial sufficiently created a jury question as to whether Coho retained substantial control over the workover site. As such, this issue is without merit.

**(2) The owner is not liable for the death or injury of an independent contractor or his employees resulting from dangers that the contractor, as an expert, knows or reasonably should know.**

¶31. Coho and Cockrell next argue that the contract charges Smith Brothers with knowledge of the site conditions, and Smith Brothers' employees were in a superior position to observe the response of the soil and site conditions to their work. They argue that Langley testified that the site was soft and that is why Smith Brothers decided to use a double wide beam to support the workover rig. Also, Stroo and Langley had observed the sinking of the pipe mat on which they the racked the pipes several days before the accident and decided to add additional boards for support. Coho and Cockrell contend that under the holding of *Jones*, they had no duty to warn of a danger Smith Brothers and its employees should reasonably have appreciated. In *Jones*, we held:

> even if there existed a duty on the part of Howard [the owner] to make the premises safe, the only way in which that duty would remain intact is if . . . [the] site supervisor, did not know of the condition of the soil. In *City of Jackson v. Ball*, 562 So.2d 1267, 1270 (Miss. 1990), we held that no warning need be given to employees of a contractor so long as the contractor knows of the danger.

*Jones*, 701 So.2d at 783. In *Jones*, there was a factual dispute as to whether the site supervisor actually knew of the soil conditions. *Id.* However, this Court charged the independent contractor with that knowledge anyway, because the independent contractor was charged with knowledge of the soil conditions as a prerequisite to signing the contract. *Id.* In the present case, as in *Jones*, the contract between Coho and Smith Brothers charged the latter with knowledge of the site conditions.

¶32. If Coho had been a detached owner who had merely contracted with Smith Brothers to have them perform the workover with unfettered control, then Coho would only have the duty to warn of dangerous conditions unknown by Smith Brothers. However Coho was not just a detached owner who hired an independent contractor to perform some work. Coho provided Smith Brothers with a prognosis that detailed, step-by-step, how to perform the work. Coho had a company man at the work site and retained substantial control over the job. Coho's district production manager, Gerald Ruley, admitted that it had a duty to provide a safe work site in the following exchange:

> Q. Well, as the Coho company man, did Coho have a duty or responsibility to provide a safe place to work for these men that you hired to come out there and rig up on Coho's property? Did you have that duty?
>
> A. It's our - - it's our duty and this is what we try to do in all cases to provide as safe working conditions as we can for anybody. We are not going to let our thoughts about profits or anything override our concern for safety in any case that we see that we can do something about. That is our policy.

¶33. Therefore, Coho had a duty not only to warn of dangerous conditions, it had a duty to supervise in a safe manner. Thus, this issue is without merit.

### *(C) Plaintiffs Failed to Establish Any Duty on the Part of Coho and Cockrell to Perform Soil Test or Site Preparation Work.*

¶34. Coho and Cockrell next argue that there was no basis in the record for finding a duty to perform a soil test or any additional site preparation; no evidence of a dangerous soil condition; and no evidence of a causal connection between any alleged failure and the accident.

¶35. According to Coho, all witnesses who offered testimony on the issue of site preparation testified that, whether by custom of the industry, or by the course of performance of the parties, Smith Brothers had the responsibility to decide what, if any, additional site work was needed in order to perform its work safely. If such site preparation was necessary, Smith Brothers would request Coho to perform such work before Smith Brothers would rig up its equipment. Further, both tool pushers testified that the site at issue was sufficiently prepared to perform their work safely without any additional site preparation and there was no evidence of any dangerous condition.

¶36. However, as McCarthy points out, every witness who testified concerning this issue stated that Coho was responsible for the well site preparation. Further, it is undisputed that Coho did nothing to inspect or prepare the well site before Smith Brothers began performing the workover. Cockrell agreed that it was absolutely necessary that the pipe rack be supported by a suitable foundation.

¶37. When Coho's district production manager was being cross-examined at trial, the following exchange took place:

Q. Well, would you agree with me that at least one of the safety factors that you would look at would be the condition of the soil underneath the racking board? That would be at least one factor that could have caused this rig to fall over, could it not?

A. That could be at least one factor but not the sole factor.

Q. All, right. And if that were a factor and if it's your duty as Coho to provide a safe place to work, would one of those duties in providing a safe place to work be site preparation work?

A. Yes, one of those duties would be site preparation work.

Q. And there's no duty whatsoever upon Smith Brothers or any of their employees to do any site preparation work, is it?

A. There is a duty upon everyone when it comes to safety.

Q. That wasn't my question. My question was whether or not they had any duty with reference to site preparation work?

A. They have no duty to my knowledge toward - - toward site preparation work.

. . .

Q. Well, did Coho hire a soil expert before they rigged up on this location?

A. Not to my knowledge.

Q. Did Coho prep this site like it would have been prepped a site where they were drilling a new well, did they do that?

A. Not to my knowledge.

¶38. Clearly there was a jury question as to whether Coho and Cockrell were negligent in not performing soil tests or site preparation. This issue is without merit.

¶39. In conclusion as to Issue I, Coho and Cockrell assert several reasons why the trial court's denial of motions for JNOV and directed verdict was improper. However, we conclude there is substantial evidence in support of the verdict when we consider the evidence in the light most favorable to McCarthy and the Stroos, giving them the benefit of all favorable inference that may be reasonably drawn from the evidence. Even though reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, pursuant to our standard of review we must affirm.

## II. ALLOWING DR. HAMMITT TO OFFER EXPERT TESTIMONY ABOUT SOIL CONDITIONS AND CAUSATION.

¶40. Dr. George Hammitt was offered as an expert in the field of soil mechanics as a civil engineer who was able to give an opinion as to why the rig overturned. The court accepted Dr. Hammitt as an expert witness, with Coho and Cockrell waiving voir dire on his qualifications, yet objecting to his offering an opinion as to the soil conditions.

¶41. Dr. Hammitt obtained a Ph.D. in geotechnical and soils engineering from Texas A&M University. He was chief of the airfields and pavement division of the U.S. Army Waterways Experiment Station in Vicksburg, the largest research and development facility within the U.S. Army Corps of Engineers. He provided soils analysis for the recommendation of proper foundations to support roads and landing fields. He is extensively published, has taught on the university level, and has served as a consultant within his field. Moreover, he has been qualified as an expert in courts of this state and other jurisdictions in the area of soil mechanics.

¶42. Coho and Cockrell argue that Dr. Hammitt had no experience in oilfield work and no knowledge of the duties and responsibilities of the various parties involved in oilfield work, and thus could not be an expert in that specific field. Additionally they argue that Dr. Hammitt's opinion failed to address the physical forces acting on the rig at the time of the accident and that he sampled the soil from 50 to 100 feet from the well, not at the well site where the accident occurred.

¶43. According to the Mississippi Rules of Evidence, where scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, the qualified witness may testify. Miss. R. Evid. 702. As this Court stated in *Roberts v. Grafe Auto Co.,* 701 So. 2d 1093, 1098 (Miss. 1997): "The admission of expert testimony is addressed to the sound discretion of the trial judge." "Unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand." *Id.*

¶44. Dr. Hammitt testified that his soil sampling complied with good engineering practices. He testified that if crushed stone or gravel had been added to the site prior to commencing the workover, the soil would have been sufficiently strong to support the weight of the pipes and the accident would not have occurred.

¶45. Clearly Dr. Hammitt's testimony would assist the trier of fact to understand the evidence or to determine whether Coho was negligent in failing to conduct soil tests or any further site preparation. The trial court did not abuse its discretion in determining that Dr. Hammitt was qualified as an expert, and it

properly allowed Dr. Hammitt's testimony as to soil conditions and the cause of the rig's overturning. This issue is without merit.

### III. REFUSING TO ALLOW EVIDENCE OF SUBSEQUENT REMEDIAL MEASURES.

¶46. Coho and Cockrell argue that they were denied an opportunity to put on evidence of subsequent remedial measures which proved that after the accident, Smith Brothers provided a substantially larger, stronger and more stable mat to be used for racking the pipes. Mississippi Rule of Evidence 407 provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, **control,** or feasibility of precautionary measures, if controverted, or impeachment.

Miss. R. Evid. 407 (emphasis added). Coho and Cockrell argue that it was reversible error for the trial judge not to allow further questioning, after initially letting them ask a few questions on this topic. They argue they were introducing evidence of subsequent remedial measures to establish control, not to prove negligence. At trial, the following exchange transpired:

> Q. Now, has Smith Brothers changed anything about the way they rack pipe as a result of this accident?
>
> MR. SIMS: We object, if the Court Please. That's subsequent remedial measures.
>
> MR. ELLINGBURG: Your Honor, Smith Brothers isn't being sued. There's no claim of negligence against Smith Brothers.
>
> THE COURT: I'll overrule the objection on that basis.
>
> A. Yes, sir. We - - change from racking on loose boards, you know, boards stacked on top of each other to a formed mat which is three layer of two-inch boards bolted together, and they have a cable running through each end.
>
> Q. And is it a somewhat bigger mat?
>
> A. Oh. Yes, sir.
>
> Q. Has Smith Brothers started requiring or have they ever requested that Coho run soil tests at workover sites before they rig up to do their work?

¶47. During recess, the court advised counsel that it had reconsidered its initial ruling and decided not to allow further questioning on subsequent remedial measures. Coho and Cockrell claim this premature termination of this line of questioning was prejudicial error. However, as the Stroos point out, the jury did hear about the subsequent remedial measure concerning changing the type and size of the mat. Then, the attorney voluntarily moved on to other issues and began questioning about soil tests. It was not until recess that the judge decided that it would not allow any further questioning in this area. As previous stated, we review evidentiary rulings by the trial court on an abuse of discretion standard. While it may have been error to not allow any further questioning on this topic, we fail to see how it was prejudicial. Coho and Cockrell

were clearly able to get before the jury the fact that Smith Brothers had changed the type and size of the racking mat after the accident. This issue is without merit.

## IV. PREJUDICIAL STATEMENTS MADE BY PLAINTIFFS' COUNSEL

¶48. Coho and Cockrell next argue that opposing counsel carried on a course of conduct throughout the trial, through questioning, comments, and innuendo that was calculated to mislead and inflame the jury and prevent the jury from impartially considering the facts and instructions given by the court. Specific instances cited included questioning about an alleged agreement between Coho and Smith Brothers to falsely place the blame on Smith Brothers so Coho could escape liability; questioning concerning whether Smith Brothers had given each of the employees $100 after the accident and instructed them to tell no one about what happened; and implying that Smith Brothers was represented by Coho's attorney at the trial. McCarthy and the Stroos respond that Coho and Cockrell often failed to timely object at trial. And when they did timely object, the trial court offered to admonish the jury to disregard the remarks.

¶49. The first time that a motion for mistrial was made regarding the questioned course of conduct was after the plaintiffs had rested. Coho and Cockrell did not move to strike, nor for a curative instruction.

¶50. Our standard of review of the trial court's decision whether to grant a mistrial is abuse of discretion:

> Case law unequivocally holds that the trial judge is in the best position for determining the prejudicial effect of an objectionable remark. The judge is provided considerable discretion to determine whether the remark is so prejudicial that a mistrial should be declared. Where serious and irreparable damage has not resulted, the judge should admonish the jury then and there to disregard the impropriety.

*Roundtree v. State*, 568 So.2d 1173, 1177-78 (Miss. 1990)(internal citations omitted). Further, the aggrieved party must make a timely objection. In *Meena v. Wilburn,* 603 So. 2d 866 (Miss. 1992), this Court stated:

> Of utmost importance, a judge can only make a determination of prejudice if the defendant makes a timely objection and motion for mistrial . . . . [t]imeliness means the objection and motion must be made contemporaneously with the alleged improper utterance. This is well-known as the "contemporaneous objection rule." . . . Contemporaneousness is critical because it allows the judge to avert a mistrial, if possible, by admonishing the jury to disregard the utterance.

*Id.* at 874.

¶51. In his denial of Coho and Cockrell's motion for JNOV or new trial, the trial judge found there were no errors, which were the subject of objections and motions for mistrial, that affected the outcome of the case in any material way or affected the defendants' right to a fair trial. After review of the alleged infractions, keeping in mind our standard or review, we conclude that any prejudice was minimal and that the trial judge did not abuse his discretion by denying a mistrial. This issue is without merit.

## V. REFUSING TO ALLOW EVIDENCE OF WORKERS' COMPENSATION AND SOCIAL SECURITY BENEFITS.

¶52. At trial, Coho and Cockrell requested that the trial judge allow them to counter opposing counsel's assertion that "[P]laintiffs were going home with nothing" by putting on evidence of their recovery of

workers' compensation and social security benefits. Coho and Cockrell claim that they also needed to put on evidence of these other benefits to counter opposing counsel's assertion that the plaintiffs were poor and that the trial court's denial of this request was reversible error.

¶53. The trial court considered the plaintiffs' motion to exclude this information in limine, at which time Coho and Cockrell assured the court they would not attempt to violate the collateral source rule by offering evidence of such payments. McCarthy and the Stroos argue that their statement about going home with nothing did not intimate they were poor, and was instead intended to show the potential bias of a witness. As we stated in *Central Bank of Mississippi v. Butler*, 517 So.2d 507 (Miss. 1987):

> Mississippi has adopted and follows the "collateral source rule." Under this rule, a defendant tortf easor is not entitled to have damages for which he is liable reduced by reason of the fact that the plaintiff has received compensation for his injury by and through a totally independent source, separate and apart from the defendant tortfeasor.

*Id.* at 511-12. Further, in *McCary v. Caperton*, 601 So.2d 866, 868-69 (Miss. 1992), the defendant argued "that the evidence was not offered to the jury for the purpose of reducing the amount of the award that the jury would return, if any, but was instead offered for the express purpose of showing that McCary was engaged in a scam; that she was trying to collect for injuries she never suffered." We held, "[W]e have never recognized such an exception to the collateral source rule, and we refrain from doing so here." *McCary*, 601 So.2d at 869.

¶54. Coho and Cockrell are essentially arguing for an exception to the collateral source rule, to rebut an averment of poverty by the plaintiff, yet they cite no authority for this exception. We have never recognized such an exception and decline to do so here.

¶55. On the other hand, it could be argued that McCarthy and Stroo opened the door by their statement that the plaintiffs would leave with nothing and that fairness requires the court to allow Coho and Cockrell to put on evidence to counter that assertion. Under that scenario, it was error for the trial court not to allow the evidence of the other benefits that they had already received. However, this error does not rise to the level of reversible error, and the trial court did not abuse its discretion by not allowing Coho and Cockrell to put forth such evidence.

## VI. AWARDING PREJUDGMENT INTEREST.

¶56. After the judgment, McCarthy and the Stroos filed a motion for prejudgment interest. At the hearing on the motion, the trial judge stated:

> THE COURT: Okay. We'll do the prejudgment interest first, I guess, and I have a shortcut method of doing that. And y'all can tell me if its wrong, but I look at the complaint, and if the complaint asked for prejudgment interest, my policy has been to grant it.

¶57. And he did. Coho and Cockrell argue that the decision was arbitrary on its face because the judge did not even consider any of the specific circumstances under which Mississippi law recognizes a party's right to prejudgment interest, and thus the trial judge abused his discretion. We agree. Moreover, even if the judge had not abused his discretion, the statute, as interpreted by this Court, warrants determination that prejudgment interest was not proper. Pursuant to statute:

All judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered. All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.

Miss. Code Ann. § 75-17-7 (2000). This Court has interpreted the statute as follows:

An award of prejudgment interest rests in the discretion of the awarding judge. Under Mississippi law, prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made or where the denial of a claim is frivolous or in bad faith. **No award of prejudgment interest may rationally be made where the principal amount has not been fixed prior to judgment**.

*Warwick v. Matheney*, 603 So.2d 330, 342 (Miss. 1992)(internal citation omitted)(emphasis added).

¶58. In the case sub judice, the principal amount was not fixed prior to judgment; therefore no award of prejudgment interest could rationally be made and it was an abuse of discretion for the trial judge to do so. We reverse and render the award of pre-judgment interest.

### VII. AWARD TO PATTI STROO FOR LOSS OF CONSORTIUM.

¶59. "A married woman shall have a cause of action for loss of consortium through negligent injury of her husband." Miss. Code Ann. § 93-3-1 (1994). This Court has interpreted this statute as follows:

The interest sought to be protected is personal to the wife and arises out of the marriage relation. She is entitled to society, companionship, love, affection, aid, services, support, sexual relations and the comfort of her husband as special rights and duties growing out of the marriage covenant. To these may be added the right to live together in the same house, to eat at the same table, and to participate together in the activities, duties and responsibilities necessary to make a home. All of these are included in the broad term, 'conjugal rights'. The loss of consortium is the loss of any or all of these rights, but damages recoverable by a wife in an action for loss of consortium under the statute must be limited to avoid double recovery for the same damages by both husband and wife . . . . Consortium does not consist alone of intangible mental and emotional elements, but may include services performed by the husband for the wife which have a monetary value.

*Tribble v. Gregory*, 288 So.2d 13, 16-17 (Miss. 1974)(internal citations omitted).

¶60. Coho and Cockrell argue that none of the elements of recovery for any type of loss of consortium were proven at trial, and to allow Patti Stroo to recover $10,000 for same would allow for double recovery. Further, they argue that Patti Stroo never testified at trial concerning her personal losses. The Stroos respond that Bobby Stroo adequately testified concerning the loss of his ability to aid and provide services and to participate in activities and duties related to making a home. The Stroos also claim that this Court has never required that a plaintiff testify in her own behalf regarding loss of consortium, if the case is properly proven by other witnesses. Coho and Cockrell agree that Patti was not required to testify in her behalf, but argue that "there was no evidence from any witness as to loss of consortium." (emphasis in original).

¶61. In fact, that argument is supported by Dr. Alan Freeland, Bobby Stroo's treating physician, who

testified as follows:

> Q. It would - - okay. To come back to my question, in view of the fact he can take his own time, would you expect him to be able to do routine household things that men usually do around the house when they are at home helping their wife?
>
> A. I think so. There might be some specific things that he couldn't do or have more trouble with, but I think he would be doing most things probably at his own pace.
>
> . . .
>
> Q. Is there any reason he can't have a normal sex life?
>
> A. None that I know of.

¶62. We recognize the difficulty of proving loss of consortium and placing a value on elements of a consortium claim. Patti Stroo's claim was based upon the loss of aid and services and the loss of participation with activities and duties related to making a home. Bobby Stroo testified as to what he has not been able to do physically at work or home as a result of his broken wrist and the surgery for his injury. His entire testimony regarding matters which might be construed to fall within the scope of the conjugal rights enumerated in *Tribble,* is found in the direct examination of Bobby Stroo regarding the broken bones in his wrist, as follows:

> Q. Does the pain cause you any problems sleeping at night?
>
> A. I wake up constantly. I mean, if I turn-if I turn wrong or if I roll over on it, it will wake me up.
>
> . . .
>
> Q. Has the injury that you received caused any limitation on the activities that you could do before you had this injury?
>
> A. Yes, sir. I'm an avid hunter or I was. I used to go all the time fishing. Mowing. I got two boys growing up. I played football. Before I had the surgery from Dr. Freeland, I couldn't do none of it. Now, I do have a little bit I can do with the boys. I may go out and throw a football five, six times and that's it, and it goes to hurting and back in the house I go.
>
> Q. With reference to your household working chores, are there any limitations on what you can do after the injury as opposed to what you could do before the injury?
>
> A. Yes, sir. I'm - I'm a yard fanatic. I like to cut yard. I do all the lawn mowing or did until the accident, and I always told my wife she wouldn't never have to do no yard work. Well, I lied. She had to get out there. My boys and my daughter had to get out there and do the work. And right now I can do some, but mostly the boys take care of the yard, the flower beds, anything else that's got to be done, garden. They don't like it, but they do it.

The direct examination then returned to limitations on Bobby Stroo's ability to work in the oil field. **Nowhere else in the record is there further evidence which could even arguably be construed as pertaining to Patti Stroo's loss of consortium claim**.

¶63. Bobby Stroo's testimony regarding his own physical limitations for which he recovered an award cannot prove his wife's damages for the same physical limitations in a loss of consortium claim.

¶64. Justice Diaz's separate opinion cites *Alldread v. Bailey*, 626 So.2d 99 (Miss. 1993), for his contention that there was sufficient evidence to support Patti's loss of consortium award. In *Alldread*, the wife was injured in an automobile accident and received a judgment on her negligence claim. *Id.* However, the jury found against her husband on his derivative loss of consortium claim, even though the following evidence was introduced:

> Mrs. Alldread testified her family was "just a normal family" prior to the accident. She stated that they would go to the park together or go fishing, and she and her husband played racquetball and walked. She testified she did the majority of the household duties. After the accident, she was able to do housework, but normally did not do anything that required a lot of stooping and bending. She stated that after the accident her husband and children did most of the housework. In discussing her sexual relations, Mrs. Alldread stated that prior to the accident, she and her husband had relations two or three times a week; however, since the accident, they had sexual relations once a month or less. She stated she no longer plays racquetball.

*Id.* at 100. The jury concluded that the husband had suffered no loss, and this Court unanimously affirmed.

¶65. Justice Diaz cites the following evidence, **elicited from Bobby Stroo's testimony,** as proof of Patti's loss of consortium: (1) because of pain, Bobby wakes up constantly at night; (2) Bobby cannot play with his children as he used to; and (3) Bobby can no longer do the yard work. With all due respect, Bobby waking up at night, not being able to play with his children, and not being able to do the yard work, without more, is not sufficient to draw inferences of damages personal to Patti. Further, Bobby has already been awarded $1,500,000 (reduced to $840,000 by the judge) for his injuries. One can only assume that an award of that size included his loss for not being able to do the these previously mentioned activities. To award Patti damages for the same loss would result in impermissible double payment for the same injury. *See Tribble*, 288 So.2d at 16-17 ("damages recoverable by a wife in an action for loss of consortium under the statute must be limited to avoid double recovery for the same damages by both husband and wife").

¶66. As we stated in *Alldread*:

> A cause of action accruing to a party for loss of consortium is separate and distinct from that party's spouse suffering personal injury. **The spouse seeking compensation for loss of consortium must show that he or she suffered damages arising out of the other's injuries**

*Alldread*, 626 So.2d at 102 (emphasis added).

¶67. In *Purdon v. Locke*, 807 So.2d 373 (Miss. 2001), this Court recently affirmed an award of loss of consortium. However, there was substantially more testimonial evidence presented as to the wife's loss, **from both the husband and the wife**, as follows:

> testimony and evidence were properly introduced and evince **a serious decline in the Lockes' relationship subsequent to the injury**. Larry Locke testified that he was very sore and had to sleep a few nights in a recliner. When he was discharged, the doctor told him not to lift anything and to take it easy; he continues to have problems with lifting anything heavy. He testified that he has bad

nightmares and could not control his emotions. Because of his mood swings, he had to take nerve pills and sleeping pills. **Mr. Locke testified that he suffers emotional instability and this has affected his relationship with his wife. From this testimony, it is reasonable for the jury to infer loss of spousal assistance and affection.**

Rita Locke testified that before his surgery, her husband was outgoing, friendly, caring, and enjoyable to be around. After the surgery, she testified that for a long period of time **he would get upset with her and the kids** and frustrated because he could not do the things he could before. According to Mrs. Locke, her husband complained about pain and had trouble sleeping. He would sleep in the chair a lot and he did not care to be around her as much. **This emotional and physical change in behavior, <u>she testified,</u> adversely affected her relationship with her husband.** From the testimony given by Mrs. Locke, it was reasonable for the jury to infer that her relationship with her husband was adversely affected.

*Id.* at 379 (emphasis added). In contrast, in the case sub judice, there is no testimony from either Bobby or Patti, as to how Bobby's injury has adversely affected his relationship with Patti. In ***Alldread,*** in which the injured spouse testified to her limitations and how they affected her husband and children, we affirmed the finding of no loss of consortium and said that "<u>the spouse seeking compensation</u> for loss of consortium <u>must show</u> that he or she suffered damages arising out of the other's injuries." 626 So. 2d at 102 (emphasis added). Subsequently, in ***Purdon***, where both the injured husband and his wife testified, we said that it was reasonable for the jury to infer loss of spousal assistance and affection. 807 So. 2d at 379. It is speculative and contrary to precedent to allow the jury to infer that Bobby's limitations, as shown generally by the evidence before the jury, affected his relationship with Patti such that she has suffered a compensable injury.

¶68. Because the evidence offered was insufficient to even draw inferences to support Patti Stroo's personal claim for loss of consortium, the trial court's judgment of $10,000 for loss of consortium is reversed and rendered.

### VIII. ERRORS IN CHARGING THE JURY; GRANTING SOMEJURY INSTRUCTIONS WHILE DENYING OTHERS.

¶69. Coho and Cockrell next argue that the jury was not properly instructed as to the applicable law, even if the jury instructions are read as a whole. As we have said, "on appellate review, we do not isolate the individual instruction attacked, but rather we read all of the instructions as a whole." ***Payne v. Rain Forest Nurseries, Inc.***, 540 So.2d 35, 40-41 (1989). "Defects in specific instructions do not require reversal where all instructions taken as a whole fairly--although not perfectly--announce the applicable primary rules of law." *Id.* at 40-41. Further, "[t]he trial court enjoys considerable discretion regarding the form and substance of jury instructions." *<u>Higgins v. State</u>*, 725 So.2d 220, 223 (Miss. 1998). Mississippi's law on jury instructions has been summarized as follows:

Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is fairly covered elsewhere in the instructions, or is without foundation in the evidence. We have also held a court's jury instructions will not warrant reversal if the jury was fully and fairly instructed by other instructions.

*Id.* at 223.

¶70. Coho and Cockrell assert numerous errors in charging the jury. However, because loss of consortium and premises liability are discussed more fully in other sections of this opinion, we will not address alleged errors in those instructions here. However, we will discuss the allegation that the instructions were deficient in that they failed to allow the jury to apportion fault, between Coho and Cockrell, and among other parties. We will also discuss the jury instruction that dealt with loss of enjoyment of life.

### A. Apportionment between Coho and Cockrell.

¶71. Coho and Cockrell object to instructions P-15 and S-P-14 because the instructions did not allow the jury to apportion fault between the defendants, or consider the fault, if any, of other persons or entities. Coho and Cockrell claim that instruction D-23, which was refused, would have correctly allowed the jury to apportion fault. They quote Miss. Code Ann. § 85-5-7(7)(1999) as follows: "In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault." However, they fail to cite any authority that states that a jury instruction, so deficient, is reversible error.

¶72. The Stroos correctly respond that the statute does not permit apportionment of liability between an employer and employee, because they "shall be considered one (1) defendant" when the liability has been caused by the employee. Miss. Code Ann. § 85-5-7(3)(1999).

The Stroos further argue that even though it is true that instruction P-15 did not contain a sufficient form for the defendants, instruction D-9 sufficiently instructed the jury as to the form, if the jury found in their favor. Thus, taking P-15 and D-9 together, the jury had ample opportunity to find for the defendants if it was so inclined. After a close examination of the jury instructions at issue, we agree.

### B. Apportionment of fault to other parties.

¶73. Coho and Cockrell further argue that the trial court should have instructed the jury to take into consideration the fault of a party not present in the lawsuit, as well as the fault of the parties to the suit. This means that any negligence attributable to Smith Brothers, its employees, Ainsworth or any other participants to the well workover should have been taken into account.

¶74. The Stroos respond that the law at the time of the trial was **McBride v. Chevron U.S.A.**, 673 So.2d 372, 381 (Miss. 1996), which made it permissible, but not mandatory, to permit juries to consider the fault of settling defendants.[(2)] While jury instructions were being discussed in chambers, the trial judge said:

> THE COURT: I agree. The statute seems to say you can [have the jury consider the fault attributable to a non-party]. Up until recently I would put in unnamed tortfeasors or unsued tortfeasors and I've been convinced since **McBride** that was probably wrong. So I stopped doing that.

¶75. The Stroos further argue that an interrogatory question was posed to Coho and Cockrell during discovery seeking the identity of any other parties that they would contend had caused the accident. They did not identify any other party in their answer, nor did they supplement that response to name Smith Brothers. As such, they waived any right they may have had to apportion fault to Smith Brothers.

### C. Loss of enjoyment of life.

¶76. Instruction P-13 allowed the jury to consider awarding damages to McCarthy's estate for any or all the following elements: mental anguish; net present cash value of future earnings; loss of enjoyment of life;

loss of love, society and companionship with their father, if any, which each of McCarthy's children would have enjoyed; loss of nurture, training and guidance each child would have received, and the cost of the funeral and burial. There was no instruction which defined any of these six elements. Instruction P-15 provided for a general verdict, directing that if the jury found for the Plaintiff, they should simply fill in the blank with the one total amount.

¶77. McCarthy's certified financial analyst did not present to the jury any testimony regarding the value of loss of enjoyment of life. There was minimal testimony from family members about what Kelvin McCarthy enjoyed doing and would be unable to enjoy due to his untimely death. In closing argument, the McCarthy's attorney mentioned specific dollar figures only for net present value of lost earnings ($327,977) mental anguish ($100,000) and loss of enjoyment of life ($817,823) but then ended his argument requesting that the jury return a verdict for $3,500,000. No further testimony was before the jury regarding loss of enjoyment of life, and no instruction gave any specific dollar amount for any of the six elements mentioned above. Because the record does not reveal whether any amount of the damages awarded by the jury was for loss of enjoyment of life, and because the question of the applicability of damages for the loss of enjoyment of life in cases where death is instantaneous is yet unanswered, we cannot say that the trial court was in error on this issue.

¶78. In conclusion, although there may have been some defects in specific instructions, where all instructions taken as a whole fairly--although not perfectly--announce the applicable primary rules of law, reversal is not warranted. This issue is without merit.

## IX. ALLOWING INTRODUCTION OF EVIDENCE CONCERNING INSURANCE.

¶79. Coho and Cockrell next assert that the trial court erred by not granting a mistrial after attorney for plaintiffs elicited testimony concerning insurance as follows:

Q. Tell the ladies and gentlemen of the jury what lawyers represented you in that matter when you first got sued?

A. When I first got sued?

Q. Yes, sir. Up until last week?

A. The lawyers - - the Smith Brothers **insurance** lawyers.

(emphasis added).

¶80. In *Jackson v. Daley*, 739 So.2d 1031, 1039 (Miss. 1999), we stated: "It is well established in this state that evidence of insurance or lack thereof may not be presented at a trial to show who would have to pay the judgment." However, in *Meena v. Wilburn*, 603 So.2d 866 (Miss. 1992), we said:

The general rule that insurance should not be mentioned before a jury has long been adhered to by this Court because it was thought to prejudice a defendant. However, "[t]he likelihood of the [defendant] being prejudiced by the mention of insurance has been diminished in recent years because most jurors, and other citizens, ... share the common knowledge [regarding coverage of] liability insurance." Such awareness has meant that the "mere mentioning of insurance in a trial is not cause for mistrial in all cases." The trial judge "is in the most advantageous position to correctly rule whether

> prejudice, or the lack of it, has emanated from the comment of a witness." Therefore, "a large discretion has been [vested in] the trial [judge] in ruling upon comments concerning insurance arising during a trial."

*Meena*, 603 So.2d at 873-74 (internal citations omitted).

¶81. In the case sub judice, Ainsworth's response that mentioned "insurance" was spontaneous, unsolicited, and non-responsive. Coho and Cockrell did not make a contemporaneous objection that would have allowed the trial judge to instruct the jury to disregard the remark. Instead, they asked to approach the bench and were advised to make a record on that point at a later time.

¶82. We find that the mere spontaneous, unsolicited and non-responsive mention of "insurance" does not rise to the level of reversible error, and the trial court did not abuse his discretion in not declaring a mistrial on this issue.

## X. SEVERING GLENN AINSWORTH FROM THE CASE.

¶83. Finally, Coho and Cockrell argue that the trial court should have continued the trial rather than severing Ainsworth only days before the trial began. The trial court severed him because close to the time of the trial, counsel for Coho, Cockrell and Ainsworth discovered a potential conflict with representing Ainsworth and filed a motion to withdraw and for substitution of counsel. Coho and Cockrell cite *Kiddy v. Lipscomb*, 628 So.2d 1355, 1357-58 (Miss. 1993), for the proposition that it is improper to sever joint tortfeasors where the actions involve the same nucleus of common facts and arise from the same transaction or occurrence.

¶84. McCarthy responds that Ainsworth was not a joint tortfeasor with Coho and Cockrell. Instead, Ainsworth was a hired consultant who was acting within the course and scope of his agency. As such, § 85-5-7(3) would prevent an apportionment of fault between Ainsworth, Cockrell or Coho.

¶85. The Stroos argue that *Kiddy* is factually inapposite to the case at bar because it involved two defendant doctors in a medical malpractice case. In *Kiddy*, one of the defendant doctors did not want to be joined at trial with the other defendant doctor because the latter had been indicted in a highly-publicized child pornography case. *Kiddy*, 628 So.2d at 1357. This Court held that the plaintiff had a right to have the two doctors joined in the same suit because to do otherwise would have allowed the doctors to "divide and conquer," thus allowing each doctor to point at the "empty chair" and prevent the jury from hearing the entire case. *Id.* at 1358. The Stroos correctly argue that *Kiddy* does not stand for the proposition that multiple defendants have the right to always be joined in the same action. Regardless, even if Ainsworth had not been severed, he would not have separate liability apart from his employer. Thus, the trial court did not abuse its discretion in severing Ainsworth prior to the trial.

## CONCLUSION

¶86. We conclude that it was error for the trial court to award McCarthy and the Stroos prejudgment interest. We further conclude that it was error for the trial court to award Patti Stroo money on her loss of consortium claim. We reverse and render on both of those issues. On all other issues before us on appeal, we affirm the judgment of the trial court.

¶87. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**PITTMAN, C.J., SMITH, P.J., WALLER AND CARLSON, J.J., CONCUR. McRAE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ AND EASLEY, JJ. DIAZ, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J., EASLEY AND GRAVES, JJ.**

**McRAE, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶88. I agree with Justice Diaz's dissent concerning the loss of consortium issue. I would write further to note that the majority misreads the holding in *Tribble v. Gregory*, 288 So.2d 13 (Miss. 1974), supporting Miss. Code Ann. § 93-3-1 (1994). In that case, we held, and the majority notes, that conjugal rights include the loss of society, companionship, love, affection, aid, services, support, sexual relations, comfort from the spouse, the right to live together in the same house, to eat at the same table, and to participate together in the activities, duties and responsibilities necessary to make a home. 288 So.2d at 16. There is no double recovery in this case. There is enough evidence in the record to substantiate the $10,000 assessment by the jury for Patti's damages on the loss of consortium claim. The majority is cutting out Patti's claim all together when there is clearly evidence to show that there is some loss of consortium that does not overlap or duplicate the damages claimed by Bobby. The jury had it right; and therefore, I would affirm on that issue.

¶89. As to the issue of prejudgment interest, Miss. Code Ann. § 75-17-7 (2000) states that "all other judgments shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no even prior to the filing of the complaint." The statute clearly allows the plaintiffs here to have prejudgment interest, and the majority overtly takes that right away.

¶90. The majority narrowly zeroes in on our holding in *Warwick v. Matheney*, 603 So.2d 330, 342 (Miss.1992), where we held that "[n]o award of prejudgment interest may rationally be made where the principal amount has not been fixed prior to judgment." (citations omitted). However, the majority overlooks our holding that "[p]rejudgment interest may be allowed where the amount of loss is in dispute." See *Preferred Risk Mut. Ins. Co. v. Johnson*, 730 So.2d 574, 577 (Miss. 1998) (citing *Commercial Union Ins. Co. v. Byrne*, 248 So.2d 777, 783 (Miss. 1971). In *Byrne* this Court stated "we can envision cases where, in the discretion of the trial court interest should be allowed although the amount of the loss is in dispute and for this reason we do not foreclose the allowance of interest in every case where the claim is unliquidated."*Byrne*, 248 So.2d at 783. *Accord*, *Johnson,* 730 So.2d at 577-78. Prejudgment interest "is allowed as compensation for the detention of money overdue." *Id.* (citations omitted). Liability has been established here, and money is owed to the Stroos. Therefore, the prejudgment interest award was proper.

¶91. Regardless of any "dispute" as to the amount of loss, the trial court got it right. We have allowed prejudgment interest in many cases from the date of the filing of the complaint forward. *See Pub. Employees' Ret. Sys. v. Langham*, 812 So.2d 969, 975 (Miss. 2002); *Fred's Stores of Miss., Inc. v. M & H Drugs, Inc.*, 725 So.2d 902, 921 (Miss. 1998). We have held in other cases that a party was entitled to prejudgment interest, and the trial courts in those cases did not abuse their discretion. Here, the 8% prejudgment interest award was reasonable, and the trial court should be affirmed.

¶92. While I agree to affirm on all other issues, I dissent on the reversal of the loss of consortium and the prejudgment interest claims.

**DIAZ AND EASLEY, JJ., JOIN THIS OPINION.**

**DIAZ, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶93. Because I disagree with the majority's decision to reverse the trial court as to the loss of consortium issue, I respectfully dissent. The majority finds that the Stroos presented insufficient evidence to prove Mrs. Stroos loss of consortium claim because Mr. Stroo's testimony as to his physical limitations cannot prove Mrs. Stroo's loss of consortium claim. I disagree.

¶94. As pointed out by the majority, the basis for a claim of loss of consortium is as follows:

> The interest sought to be protected is personal to the wife and arises out of the marriage relation. She is entitled to society, companionship, love, affection, aid, services, support, sexual relations and the comfort of her husband as special rights and duties growing out of the marriage covenant. To these may be added the right to live together in the same house, to eat at the same table, and to participate together in the activities, duties and responsibilities necessary to make a home. All of these are included in the broad term, "conjugal rights." The loss of consortium is the loss of any or all of these rights. . . Consortium does not consist alone of intangible mental and emotional elements, but may include services performed by the husband for the wife which have a monetary value. . .It should be kept in mind always that the wife's recovery is for *losses suffered by her*.

*Tribble v. Gregory*, 288 So. 2d 13, 16-17 (Miss. 1974).

¶95. In the case at bar, I believe it has been proved that Mrs. Stroo suffered a loss of services and support from her husband after he was injured. This Court must assume that the jury drew every permissible inference from the evidence offered in favor of the appellee. *Alldread v. Bailey*, 626 So.2d 99, 102 (Miss.1993). A spouse who is seeking damages for loss of consortium has the burden of showing that he or she suffered those damages and is entitled to compensation. *Id.* A jury is free to believe or disbelieve the facts presented to it and to evaluate all witnesses and evidence to determine whether the complaining spouse was damaged in a loss of consortium action. *Id*.

> We emphasize that our powers on appellate review are ... restricted. Our institutional role mandates substantial deference to the jury's findings of fact and to the trial judge's determination whether a jury issue was tendered.... We see the testimony the trial judge heard. We do not, however, observe the manner and demeanor of the witnesses. We do not smell the smoke of the battle. The trial judge's determination whether, under the standards articulated above, a jury issue has been presented, must per force be given great respect here.

*City of Jackson v. Locklar*, 431 So.2d 475, 478-79 (Miss.1983).

¶96. In their brief, the Stroos argue that plaintiffs are not required to testify in their own behalf to prove loss of consortium. In response, Coho and Cockrell admit that there is no such requirement and simply argue that the Mrs. Stroo's loss of consortium claim is based on "no evidence." I agree with the Stroos' assertion that there is no requirement that a plaintiff testify on his or her own behalf to prove loss of consortium, and I disagree with Coho's and Cockrell's contention that there is no evidence to support Mrs. Stroo's claim of loss of consortium.

¶97. The jury was instructed as follows:

The court instructs the Jury that should you find for the Plaintiff, Patti Stroo, in this case, then you may, in determining the amount of damages suffered by her resulting from the injury to her husband, Bobby Stroo, consider the following elements of damage as have been proved by a preponderance of the evidence in this case:

b. The loss of aid, services, and physical assistance provided by Bobby Stroo;

c. The loss of participation together with the activities, duties and responsibilities of making a home.

Bobby Stroo testified that the pain from his injury wakes him up constantly during the night, that he cannot play with his children as he used to, and that, despite the fact that he had promised his wife she would never have to do yard work, she now has to do so because he cannot do it any longer. Given our deferential standard of review of jury verdicts, I believe that Mr. Stroo's testimony provided the jury with sufficient evidence to award Mrs. Stroo damages for her loss of consortium claim.

**McRAE, P.J., EASLEY AND GRAVES, JJ., JOIN THIS OPINION.**

1. In his deposition when asked whether his job was the company man, Cockrell responded: "No, sir. My title is workover and completion foreman."

2. McCarthy has supplemented his brief, pursuant to Rule 28(j) on the Mississippi Rules of Appellate Procedure, with *Accu-Fab & Constr., Inc. v. Ladner*, 778 So.2d 766 (Miss. 2001). In *Accu-Fab,* we held that "the exclusion of the immune party is the best approach." *Accu-Fab,* 778 So.2d at 771.