961 So.2d 741 (2007)
INTERNATIONAL PAPER COMPANY, Appellant
v.
James Alvin TOWNSEND, Appellee.
No. 2003-CA-02774-COA.
Court of Appeals of Mississippi.
April 3, 2007.
*745 Michael O. Gwin, David Earl Rozier, Jackson, attorneys for appellant.
Thandi Wade, Anita M. Stamps, and Larry Stamps, Jackson, Paheadra B. Robinson, attorneys for appellee.
EN BANC.

MODIFIED OPINION ON MOTION FOR REHEARING
BARNES, J., for the Court.
¶ 1. The appellee's motion for rehearing is denied. The original opinion is withdrawn, and this opinion is substituted therefor.
¶ 2. International Paper Company("IP") appeals from a jury verdict finding IP forty-eight percent liable for personal injuries sustained by James Alvin Townsend ("Townsend"), and fixing Townsend's damages at $2 million.[1] IP raises numerous issues on appeal, claiming entitlement to judgment notwithstanding the verdict or, in the alternative, a new trial. We find that Townsend presented insufficient evidence at trial to create a jury question as to IP's liability, and that the trial court therefore erred in failing to grant IP's motion for JNOV. For the sake of completeness, we also address the issue of whether IP was entitled to a new trial. We find that the trial court erred in allowing the plaintiff's expert, Royal Johnson, to testify as an expert witness, and therefore, if JNOV were not appropriate, we would reverse and remand for a new trial.

STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 3. On or about July 10, 2001, Townsend, was hauling logs from a tract of land near Rolling Fork, Mississippi, to a woodyard owned by IP in Natchez, Mississippi.[2] Townsend was working for his son's company, Kenneth Townsend Logging ("Townsend Logging"). Townsend Logging had orally contracted to haul logs for Cain Logging, which was in charge of cutting the timber on the Rolling Fork tract. Townsend testified that, after cutting the timber, Cain Logging would load the logs onto the trucks operated by Townsend Logging. The truck would then drive to a set of scales operated by Terry Dean Cain Logging ("TDC Logging"), an entity distinct from Cain Logging. TDC Logging weighed the loaded trucks and then added *746 or removed logs according to the weight. The truck driver then inspected his load, bound it down with cables and secured it, and proceeded on the highway to the IP woodyard. The driver would stop periodically along the route to check his load and tighten down the binders to account for settling and/or shifting of the load.
¶ 4. Upon reaching the IP woodyard, the truck driver was required to stop at a gate where an IP employee, or "scaler," would weigh and visually inspect the load. If the scaler observed that the logs were loaded over the top of the standards[3] of the truck, that the logs were not secured with binders, or that the wood had too many limbs or knots to meet IP's specifications, then the scaler had the authority to refuse entrance to the truck driver. Assuming that the scaler found none of these conditions, he would issue a ticket to the truck driver and allow him to proceed onto the IP woodyard. However, if the scaler refused entrance, the truck driver had the option of driving to an independent yard adjacent to the IP woodyard where, for a fee, his load would be adjusted as necessary to meet IP's standards. After being admitted to the IP woodyard, the truck would drive approximately one-half to three-fourths of a mile into the woodyard to an unloading area, where the truck driver inspected his load and then released the binders so that a crane operated by IP could unload the logs from the truck. Until the crane was put into operation, IP employees played no part in removing the logs.[4]
¶ 5. On the day in question, Townsend was driving a two-bolster trailer supplied by Townsend Logging. He had already transported one load of wood from the Rolling Fork tract to the IP woodyard and had returned for a second load. He testified that the employees of Cain Logging loaded logs onto his truck, and, that after checking the load, he then proceeded to the weigh scales operated by TDC Logging. At the scales, TDC Logging added logs to his load. Townsend again checked his load and then bound the load with two cables across the width of the trailer, one cable in the front of the load, and one cable in the back. Having accomplished this, he proceeded to the IP woodyard. On the way to the woodyard, Townsend testified that he made two stops to check the condition of his load and to tighten the binders securing the load: once in Vicksburg, approximately 50 miles from the Rolling Fork tract, and once in Port Gibson. Upon arriving at the IP woodyard, the scaler admitted Townsend, and he proceeded into the woodyard to have his logs unloaded.[5] When he arrived at the loading area, he testified that he began "to un-ratchet the front ratchet, and that's when the log came off." A log fell from the trailer, struck Townsend in the chest, and rolled across his pelvis.[6] Although he received *747 prompt medical attention, Townsend's injuries were extensive, including a fractured leg and pelvis, and a urethral tear.[7]
¶ 6. Townsend filed suit on December 10, 2001, against IP and Cain Logging in the Circuit Court of Sharkey County. In his amended complaint, Townsend alleged that IP was liable for his injuries because it failed to maintain its premises in a safe condition, and because it failed to warn him of the dangerous condition. According to Townsend, IP did not maintain safe premises because it failed to employ an unbinding rack for unloading logs, and because the road leading into the woodyard was covered in potholes. Another failure to warn allegation was raised for the first time approximately one month before trial, in which Townsend posited that the IP scaler should have warned him of the dangerous condition existing on his truck when he arrived at the woodyard. Trial was held on May 20-23, 2003. At the close of trial, IP moved for judgment as a matter of law. This motion was denied, and the jury returned a verdict for Townsend in the amount of $2 million. The jury apportioned forty-eight percent of the fault to IP, forty-two percent to Cain Logging, and ten percent to Townsend. Both IP and Cain Logging filed post-trial motions for JNOV, new trial, and remittitur, all of which were denied by the trial court. Aggrieved by the judgment, IP and Cain Logging filed this appeal. Cain Logging settled with Townsend and is no longer a party to the appeal.
¶ 7. IP raises numerous issues on appeal. We find that the facts presented at trial are insufficient to support the judgment against IP and that IP is entitled to judgment as a matter of law; we further determine that the trial court abused its discretion in refusing to grant a continuance and in allowing Royal Johnson to testify as an expert witness. Therefore, even if IP were not entitled to JNOV, we would reverse and remand for a new trial.

ISSUES AND ANALYSIS
I. WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT IP'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.
¶ 8. IP argues that it is entitled to judgment as a matter of law because Townsend took a "shotgun" approach and merely presented the jury with varying inconsistent theories of IP's liability, thereby allowing the jury to speculate as to IP's liability for Townsend's injuries. Specifically, Townsend was allowed to present three theories of IP's liability to the jury. First, Townsend posited that IP was liable because the IP scaler failed to warn Townsend of the dangerous condition existing on his truck. Second, Townsend and his proffered expert speculated that the condition of the road in the IP woodyard caused Townsend's load to shift excessively, thereby causing his injury. Finally, Townsend presented to the jury the theory that IP maintained unsafe premises because it failed to have an unbinding rack on the *748 premises, and that an unbinding rack would have caught the log that injured him.
¶ 9. IP argues, correctly in our estimation, that Townsend's first two theories of liability are inconsistent: if the potholes on the IP road caused Townsend's load to shift, then the IP scaler could not have seen the danger because Townsend would already have passed by the scaler when he encountered the potholes. On the other hand, if the defect in Townsend's load was apparent when he arrived at the IP woodyard, then the potholes on IP's premises could not have been the cause of the defective load. Furthermore, IP contends that, because Townsend was an independent contractor, it owed him no duty to warn. This lack of a duty to warn is magnified, IP argues, by the fact that the defective condition existed on Townsend's trailer, not on the IP premises, and by the fact that IP exercised no control over the details of Townsend's work. IP argues that there was insufficient evidence to create a jury issue on the duty of IP to provide an unbinding rack, because neither Townsend nor his expert was able to substantiate their claims that an unbinding rack would have prevented the injury to Townsend. The end result, IP argues, is that there were insufficient facts to create a question of IP's liability for the jury. Instead, the jury was allowed to speculate as to possibilities of what may have caused Townsend's injury, without sufficient facts to make any one possibility more likely than not the proximate cause of Townsend's injury.
¶ 10. Townsend's response to these arguments is that IP was a premises owner that exercised control over aspects of his work, and that IP therefore owed him a duty. Townsend argues that IP exercised control over Townsend's work because IP inspected loads for safety when they arrived at the woodyard, and that IP had the power to refuse entrance to loads that did not meet its safety requirements. Townsend also presents the testimony of both Townsend and his expert that there were logs on Townsend's trailer which were "loaded short,"[8] and that an unbinding rack would have caught the log which injured him. This testimony, Townsend argues, was sufficient to create a jury issue on IP's negligence.
¶ 11. After a careful review of the facts of this case, we find that there is insufficient evidence to create a jury issue of IP's liability. The facts and testimony presented by Townsend are not sufficient to allow a reasonable juror to find that IP owed the duties to Townsend that he claims, much less to allow a jury to find that any one of Townsend's three theories of liability against IP was the proximate cause of his injuries.
A. Standard of Review
¶ 12. The standard of review for the denial of a motion for JNOV and a motion for directed verdict are identical. Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc., 753 So.2d 1077, 1083(¶ 16) (Miss.2000) (citing Steele v. Inn of Vicksburg, Inc., 697 So.2d 373, 376 (Miss.1997)). "This Court will consider the evidence in the light most favorable to the appellee, giving the appellee the benefit of all favorable inferences that may be reasonably drawn from the evidence." General Motors Acceptance Corp. v. Baymon, 732 So.2d 262, 268(¶ 17) (Miss.1999) (citing Steele, 697 So.2d at 376). If the facts are so overwhelmingly in favor of the appellant *749 that a reasonable juror could not have arrived at a contrary verdict, this Court must reverse and render. Id. On the other hand, if substantial evidence exists in support of the verdict, that is, "evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions," then this Court must affirm. Id.
B. The Scaler
¶ 13. The first issue we address is whether the IP scaler owed a duty to Townsend. IP argues that the scaler did not owe a duty to Townsend for several reasons. First, IP claims that it is merely a premises owner, and as such owes no duty to an independent contractor such as Townsend. Second, IP claims that the scaler had no duty to warn Townsend of a defect that existed not on IP's premises, but on Townsend's own truck. Finally, IP argues that, even assuming that IP owed a duty to Townsend, it would have no duty to warn him of a hidden defect on his truck that was not obvious to IP. By the same token, if the defect in Townsend's load was obvious, IP argues that it would have no duty to warn because the defect would be open and obvious to Townsend himself.
¶ 14. Our law regarding the duty of a premises owner owed to an independent contractor is that the premises owner must "furnish a reasonably safe place to work or give warning of danger." Mississippi Chemical Corp. v. Rogers, 368 So.2d 220, 222 (Miss.1979). The trial court, in finding sufficient evidence of a duty owed by IP to Townsend, relied on Coho Resources Inc. v. McCarthy, 829 So.2d 1 (Miss.2002). McCarthy reiterates the rule that "the owner of the premises does not have a duty to protect an independent contractor against risks arising from or intimately connected with the work. . . ." However, "there is an exception where the owner maintains substantial de jure or de facto control over the work to be performed." Id. at 13(¶ 30). In determining whether an owner maintains control over the work of an independent contractor, "[w]hat is critical is whether the project owner maintains any right of control for the performance of that aspect of the work giving rise to the injury." Magee v. Transcontinental Gas Pipe Line Corp., 551 So.2d 182, 186 (Miss.1989). Control is shown by the "undisputed language of the contract" between the premises owner and the independent contractor. Coho Resources Inc. v. Chapman, 913 So.2d 899, 905(¶ 14) (Miss.2005) (quoting Magee, 551 So.2d at 186). However, if the plaintiff can show that "the contract notwithstanding, the owner maintained substantial de facto control over those features of the work out of which the injury arose, we may have a horse of a different color." Magee, 551 So.2d at 186. Our courts have also held that a premises owner need give no warning of a dangerous condition of which the premises owner knows or should know "so long as the contractor knows of the danger." McCarthy, 829 So.2d at 13.
¶ 15. With the law thus stated, we find insufficient evidence to support a conclusion that IP exercised control over Townsend's activities so as to create a duty. Unlike the defendant in McCarthy, IP exercised no control over that aspect of the work which gave rise to the injury. The only two possible aspects of work which could have given rise to Townsend's injury were the loading of the log that fell on Townsend, and the unloading of the same log. According to the undisputed facts admitted at trial, IP played absolutely no part in the loading of the logs. Although IP would have eventually played a part in unloading the logs from Townsend's trailer, IP's job in unloading the *750 logs did not arise until Townsend had assured himself of the safety of the load and then released the binders holding the logs in place. Ernest Carlton Hall, the woodyard area manager for IP, testified via deposition that the driver "is responsible for his load until we actually unload it . . . [h]e is responsible for unsecuring and unbinding his load. We don't take over until the crane actually picks it up." At trial, Townsend's expert stated that a truck driver should "always" look up and inspect his load before releasing the binders for unloading, and that duty falls squarely on the shoulders of the truck driver. He also agreed that no one from IP directs the hauler in the aspects of his job, or controls him in any way. Townsend testified that the only acts that the scaler performed were to allow him entrance to the woodyard after weighing his load, and to direct him to drive to one of two cranes in the woodyard to have his trailer unloaded. Townsend was completely in charge when he made the decision to release the binders on his load. Unlike in the McCarthy case, IP exercised no supervision of Townsend when he released the binders.
¶ 16. We further find that, contrary to Townsend's arguments, the ability of the scaler to reject certain loads from entering the woodyard was not sufficient to establish that the scaler was controlling the actions of Townsend. While the scaler was required by IP to check the load for quality, and to check that the logs were not above the standards, this did not establish supervision of Townsend's activities. If the scaler was dissatisfied with the quality of the load, he only had the ability to turn the load away.[9] As such, the facts undisputably establish that IP did not exert de facto control over the aspects of the work that gave rise to Townsend's injury.
¶ 17. Furthermore, the IP scaler owed Townsend no duty to warn. The dangerous condition which caused Townsend's injury existed on his truck, not on the IP premises. As stated above, Mississippi law is clear that the duty of the premises owner is to "furnish a reasonably safe place to work." Mississippi Chemical Corp., 368 So.2d at 222 (emphasis added). IP cites the case of Bevis v. Linkous Const. Co., 856 So.2d 535 (Miss.Ct.App. 2003), as being analogous to the instant case. We agree that it is. In Bevis, an employee of a subcontractor was killed when he fell from a steel structure that collapsed at a construction site. Id. at 539(¶ 7). The employee's widow sued the premises owner, among others, alleging that the premises owner owed the employee a duty to warn of dangerous conditions, and to supervise the worksite. Id. On review of a grant of summary judgment in favor of the premises owner, our Court recited the well-known rule that:
As to the premises owner in circumstances such as are alleged to have existed in this case, the duty is to surrender to the contractor a reasonably safe working environment, which would include a duty to warn of hidden hazards or defects on the property that existed prior to the commencement of the work. Any duty to warn of hazards arising out of the construction itself  assuming such duty could be shown to exist  is deemed satisfied by a showing that the contractor had actual knowledge of the hazardous condition.
*751 Id. (¶ 9) (citing Mississippi Power Co. v. Brooks, 309 So.2d 863, 866 (Miss.1975) (emphasis added); Jones v. James Reeves Contractors, Inc., 701 So.2d 774, 783 (Miss. 1997)) (emphasis added). Applying this law, our Court affirmed summary judgment in favor of the premises owner, finding that:
The hazardous condition complained of in this case did not arise out of a condition of the property created by the owner or existing on the property in a concealed state at the commencement of the project. Rather, it was a hazard created by the contractor . . . in the course of completing its duties under the construction contract. In such a situation, it is logically impossible to argue that [the contractor] had no knowledge of the condition or that [the premises owner] somehow had an awareness of both the fact of the hazardous condition and an appreciation of the dangerous nature of the condition that was superior to that of [the contractor]. . . .
Id. at 539-40(¶ 10). Similarly, we find that Townsend is charging the IP scaler with a duty to warn him of a hazard that does not exist on the IP premises, and that was not created by IP.
¶ 18. As to knowledge of the defect on his truck, Townsend testified that he had examined his truck on at least three occasions before he reached the IP woodyard, and that in each case he was completely satisfied with the appearance of the load.[10] The testimony of Charles Cain, one of the owners of Cain Logging, did establish that, from the pictures taken after the accident, at least four logs were positioned less than three feet behind the standards on Townsend's truck. However, no testimony was introduced that tended to establish that the scaler had a duty to determine whether the load on Townsend's truck was less than three feet behind the standards.[11] Townsend testified that:
As far as I understand, you can't unload unless the scaler says that load is safe. If it's not safe, if it's stacked above the stakes, he makes the decision for you to take it off. If the load ain't loaded right, he makes the decision to send you back out, and you have to get it right. So it's my understanding he is the boss until he gives you that ticket.
Regarding the scaler, he also testified that "I know that if he had inspected the load, he would have knew, like he did other times from other drivers that he had sent out of there, that it was loaded high or a piece of wood too crooked on there." Charles Cain testified that, to his knowledge, woodyards he had delivered loads to in the past had the ability to turn him away, for safety reasons, if his load was above the standards on his trailer. Craig *752 Beals, the manager of IP's environmental health and safety division, stated that the duties of the scaler were "to make certain that, one, [the load] is below the standards and, two, that it has binding  binders on it." When asked on cross-examination, he also stated, "It's the scaler's responsibility to check to see if a load is above the standards. Now, whether or not it's the scaler's responsibility to verify whether or not the log is secured between the standards, I'm sorry, I couldn't say."[12] Townsend's expert testified that, aside from the log which injured Townsend, the load on Townsend's trailer appeared to be acceptable to IP's standards. No testimony was introduced which indicated that Townsend's load had been loaded above the standards. While Townsend and his expert speculated that the log had fallen "from the top," neither testified that the log was loaded above the standards. This being the case, we find that Townsend submitted insufficient evidence to create a jury question on the IP scaler's superior knowledge of short-loaded logs which would give rise to a duty to warn Townsend.
¶ 19. We next address whether IP is liable to Townsend for failure to maintain its premises in a safe condition, and whether sufficient evidence was introduced on which a jury could find that the unsafe condition of the premises was the proximate cause of Townsend's injuries. As stated supra, Townsend put forth two theories that IP maintained unsafe premises. First, he alleged that the road through the IP woodyard that led to the unloading area was filled with potholes, which may have caused his load to shift to an unsafe degree, thereby proximately causing his injury. Second, Townsend alleged that IP's premises were unsafe because IP failed to provide an on-site unbinding rack.
C. The Potholes
¶ 20. As to the theory of potholes causing Townsend's load to be unsafe, we find that insufficient evidence was presented at trial upon which a jury could find that the potholes more probably than not were the proximate cause of Townsend's injuries. Therefore, the trial court erred in failing to grant IP JNOV on this issue. Townsend testified that he drove down the IP road for a distance of one-half to three-quarters of a mile at approximately 15 miles per hour. He stated that the potholes were so numerous that he was unable to avoid them. He stated that he "couldn't swear" to the fact that driving down this road caused his load to be unsafe, and in fact stated "I don't know whether it was in that distance it shifted or not." The only other evidence on the subject was offered by Townsend's expert, who stated on direct-examination that the condition of the woodyard "could cause some shifting." Townsend's expert had not seen the road on the day of the accident, and could not remember the last time he had been there. He did claim to have been to the IP woodyard at some point in time, and it was upon this undated visit that he based his opinion.
¶ 21. The Mississippi Supreme Court has held that "verdicts are to be founded *753 upon probabilities according to common knowledge, common experience, and common sense, and not upon possibilities; and a verdict cannot convert a possibility or any number of possibilities into a probability." White v. Yellow Freight System, Inc., 905 So.2d 506, 512(¶ 13) (Miss.2004) (quoting Elsworth v. Glindmeyer, 234 So.2d 312, 319 (Miss.1970)). Statements such as "I don't know whether . . . it shifted or not," and "it could cause some shifting" are clearly only evidence of a possibility. Townsend also agreed that a load of timber that had been properly loaded and bound would not shift to the extent that it would become unsafe. No evidence introduced at trial brought the possibility of Townsend's load shifting on the IP road into the realm of probability, and as such the evidence was insufficient to sustain a jury verdict on this issue.
D. The Unbinding Rack
¶ 22. The final theory upon which Townsend alleges liability on the part of IP is the failure to provide an unbinding rack on the woodyard premises. Townsend testified at trial that the unbinding rack would have prevented a loose log "from falling on you because it's got arms just like you would hold your arms out. It will catch the log." On cross-examination he qualified this statement by noting that the unbinding rack wouldn't catch every log that fell off the truck, but that it would have caught the log that fell off of his truck, which he claimed fell "off the top" of the truck. He later agreed that the log "could have" come from the side of the trailer. At another point, he admitted that he did not "know where [the log] came from." He also testified that he knew of more woodyards in Mississippi that did not have unbinding racks than woodyards that did, and he agreed that the number of woodyards in Mississippi that did not have unbinding racks probably outnumbered those that did by a factor of at least two to one.
¶ 23. Townsend's expert testified regarding the use of unbinding racks. On direct, he testified simply that an unbinding rack "would have caught the log" that injured Townsend.[13] On cross, he agreed that the majority of woodyards in the state do not provide unbinding racks. He testified that the primary purpose of the unbinding rack is to catch logs that are loaded over the standards of a trailer and that fall off of the top. He stated, however, that an unbinding rack would have caught the log that injured Townsend, which he claimed was not over the standards, but nevertheless fell from the top of the load. He also admitted that he was unable to say whether the unbinding rack would have caught a log that fell from the side of the truck, and that he did not know specifically where the log that injured Townsend fell from, although he was of the belief that it fell from the top. He admitted that the unbinding rack would not catch "any log" that fell from the truck. Finally, he stated that a properly loaded and bound trailer would not exhibit unsafe shifting, and that, aside from the log that fell and injured Townsend, the logs on Townsend's truck had been loaded in a manner that would pass IP's inspection to enter the yard.
¶ 24. Like the testimony presented regarding the potholes, we find that the testimony the plaintiff introduced at trial regarding the use of unbinding racks was too speculative to allow a jury to find that IP maintained unsafe premises by not providing an unbinding rack, thereby breaching a duty to Townsend. Although Townsend and his expert both emphatically stated *754 that an unbinding rack would have caught the log that injured Townsend, neither was able to explain the basis of that belief. Little testimony was introduced on what exactly an unbinding rack is, or how it operates. Townsend's expert seemed unaware that unbinding racks had been in use for a number of years, as evidenced by his statement that "I haven't went around and read no rules, but I feel like it's a safe product that each mill should be introduced to." No pictures of the unbinding rack were introduced, and the only evidence of the appearance of an unbinding rack was the oral testimony of Townsend and his expert. Townsend testified that an unbinding rack had "arms" that extended down the sides of a trailer to keep logs from falling from the trailer, and Townsend's expert testified that the operation of an unbinding rack was to unbind loads. However, neither was able to describe with specificity the height the arms were above the ground. Neither witness offered to explain how an unbinding rack unbound loads, or how it was able to catch logs that fell from the trailer. Neither witness was able to say with certainty from what part of the trailer the log that injured Townsend fell. Townsend's expert stated his belief, based on the pictures he examined, that the log fell from the top of the load, but when pressed on the issue, he admitted that it could have fallen from the side. Based on this evidence, there was only a possibility that the unbinding rack could have prevented Townsend's injury. Certainly there was not enough evidence to find that an unbinding rack more probably than not would have prevented Townsend's injury.
¶ 25. Even assuming that Townsend created a jury question as to whether an unbinding rack would have prevented his injury, he was unable to establish that IP owed him a duty to provide an unbinding rack. As stated by Townsend's expert, the primary use of unbinding racks was to prevent logs which were loaded over the standards from falling and causing injury. This testimony was corroborated by Craig Beals, who stated that unbinding racks were only designed to catch logs that fell from above the standards, and not behind the standards. Beals further testified that IP had made a corporate decision not to provide unbinding racks on their Mississippi woodyards, because IP woodyards no longer accepted loads of wood that had been loaded to a point above the standards. He testified that unbinding racks had been in use for some time because the custom of the past was to load logs above the standards of a trailer. Now that IP would not accept loads which were above the standards, the unbinding rack was useless, and even harmful because it encouraged loggers to continue to load above the standards, Beals testified. Townsend's expert acknowledged that there are more woodyards that do not have unbinding racks than woodyards that do. With these facts in mind, we cannot find that Townsend proved IP owed him a duty to provide an unbinding rack.
¶ 26. For these reasons, we find that IP was entitled to the JNOV. Accordingly, we reverse and render.
II. WHETHER TOWNSEND'S EXPERT, ROYAL JOHNSON, WAS PROPERLY ALLOWED TO TESTIFY AS AN EXPERT WITNESS.
¶ 27. IP argues that even if it is not entitled to JNOV, it is entitled to a new trial based on a number of errors it assigns to the trial court. The major assignments concern the admission of the expert testimony submitted by Townsend, and the failure of the trial court to allow apportionment to other parties that may have been *755 liable for Townsend's injury.[14] While we agree IP is entitled to JNOV, we address these major issues for the purpose of completeness.
A. Whether Johnson's untimely designation prejudiced the defendants.
¶ 28 IP argues that Townsend's expert, Royal Johnson, was not a proper expert witness, both because he was untimely designated, and because he was unqualified. Townsend designated Royal Johnson as an expert witness on March 21, 2003, fifty-nine days prior to trial. The designation referred to Royal Johnson as "Royal Jones," stated that Jones would "provide testimony concerning the industry standards for loading and unloading timber and woodyard safety," and provided that Jones would testify as to two theories of liability against IP: 1) that "the absence of a binding rack allowed the log to dislodge from the truck and injure Mr. Townsend," and 2) "that the condition of the road leading into the International Paper Company's woodyard was in extremely poor condition . . . causing the load to shift more than usual." IP joined in a motion for continuance and motion to strike Johnson as an expert, claiming that Johnson was not timely designated pursuant to Uniform Circuit Rule 4.04, and that his designation was improper. A hearing was held on the motion on April 8, 2003. The trial court ruled that, because the parties had entered an agreed order on December 12, 2002, setting trial for May 21, 2003, there was no need to grant a continuance.[15]
¶ 29 On May 12, 2003, the trial court heard several pre-trial motions including IP's motion for summary judgment and a "motion to strike and in limine" asking that Johnson's proposed testimony be stricken from the record due to his untimely designation; the motion to strike asked, in the alternative, for continuance of the trial. On the day of this hearing, Townsend submitted the affidavit of Royal Johnson in response to IP's motion for summary judgment. The affidavit for the first time alleged IP to be liable for the scaler's failure to warn Townsend of the condition existing on Townsend's truck. At the hearing, IP again renewed its objection to the untimeliness of Johnson's designation and the fact that IP had not yet had an opportunity to depose Johnson.[16] No one, however, called to the *756 court's attention the fact that a new theory of liability was being asserted. It is unclear from the record whether counsel for IP, who had just been handed the affidavit, was even aware of the addition. In his oral argument on IP's motion for summary judgment which was heard after the court's denial of the motion to strike or continue, counsel for IP stated,
In this case, all that we've seen in terms of what the plaintiff alleges against IP is two-fold: Your roads were in poor condition, and you didn't have an unbinding rack. That has been asked of the plaintiff. That has been asked of the plaintiff's son, who was his employer. They both said the same thing, and now their expert, by way of affidavit and I'm certain in his deposition, will say, you know, road conditions and unbinding rack [are] the complaint[s] we have against IP.
(Emphasis added). Counsel for Townsend did not contradict this representation and make the court and opposing counsel aware of the third theory of liability being asserted in Johnson's affidavit.
¶ 30. The trial court considered the issue of the untimeliness of Johnson's designation and found that, since the designation was made fifty-nine days prior to trial, the trial should be continued for one day to comply with the sixty day requirement of Uniform Circuit and County Court Rule 4.04.[17] Aside from this continuation, the court denied the motion in limine. The defendants were finally able to depose Johnson on May 14, five days prior to trial.
¶ 31. "The standard of review for admission or exclusion of testimony is abuse of discretion. The admission of expert testimony is left to the sound discretion of the trial judge. Unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand." City of Jackson v. Estate of Stewart ex rel. Womack, 908 So.2d 703, 708(¶ 21) (Miss.2005) (citing Crane Co. v. Kitzinger, 860 So.2d 1196, 1201(¶ 20) (Miss.2003)).
¶ 32. We examine whether the trial judge abused his discretion in failing to grant a continuance or in failing to strike Johnson as an expert witness due to the untimeliness of his designation. While we find that Johnson's designation fifty-nine (versus sixty) days prior to trial in and of itself did not prejudice the defendants, the confused circumstances that ensued following the tardy designation did unfairly tilt the playing field, and the trial court judge abused his discretion by failing to grant a continuance of the trial.
¶ 33 The trial judge based his decision to deny a continuance on the fact that the parties had entered an agreed order setting this matter for trial. However, his ruling does not account for the fact that the agreed order was subject to the completion of discovery, and does not account for arguments by the defendants that, at the time they agreed to the setting, there was a representation by Townsend's counsel that there would be no liability expert designated. From our review of the record, it is clear that the defendants were taken by surprise by Townsend's last-minute designation of Johnson. The defendants *757 were then further prejudiced by a letter from Townsend's counsel stating that Johnson would not be available for deposition until May 15 and by Johnson's adding a new theory of liability on May 12. The defendants were unable to discern the extent of what Johnson's proffered testimony would be until May 14, five days before trial. In addition, we see no harm or prejudice that could have resulted from the trial court's continuing the trial. In his order denying a motion for reconsideration joined in by the defendants dated April 10, 2003, the trial judge stated, "[a]ny failure of the parties to complete discovery or prepare for trial is a result of the parties' own lack of diligence." However, while this may have been true regarding the depositions of Townsend and other lay witnesses, we note that, at the time the order was issued, Townsend had only recently designated Johnson as an expert. It appears from the record that the defendants had not yet received Johnson's responses to the 26(b)(4) interrogatories,[18] and had been informed, apparently though typographical error on the part of Townsend's counsel, that Johnson would not be available for deposition until May 15. We therefore cannot affirm the trial court's determination that any delay with respect to expert discovery is attributable to a lack of diligence on the part of IP or the other defendants.
¶ 34. Whether or not Townsend's counsel actually intended to obtain unfair advantage over the defendants by designating Johnson at such a late date, the untimely designation, addition of a third theory of liability as to IP one week before trial and last-minute deposition, had the effect of working a severe prejudice on the company. This prejudice could have been avoided had the trial court allowed a reasonable continuation of the trial. For these reasons, we find that the trial court abused its discretion in failing to grant a continuance, and IP would be entitled to a new trial on this basis.
B. Whether Johnson was qualified to testify as an expert witness.
¶ 35. IP argues that Johnson was unqualified to testify as an expert witness and that, in any case, the company was not allowed to properly voir dire Johnson at trial. We agree and find that the trial court abused its discretion in finding that Johnson was qualified to testify as an expert witness, and abused its discretion in sustaining objections to the defendants' voir dire of Johnson at trial.
¶ 36. Admission or exclusion of expert testimony is governed by Rule of Evidence 702, which, in its current form, provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Miss. R. Evid. 702. Rule 702 was amended to reflect its current form effective May 29, 2003, several days after the trial in this matter had concluded. Also, on October 16, 2003, in Mississippi Transp. Comm'n v. McLemore, 863 So.2d 31 (Miss.2003), the *758 Mississippi Supreme Court adopted a modified Daubert standard, which enumerates a non-exhaustive list of reliability factors to be weighed by the trial court in determining the admissibility of expert testimony.
¶ 37. The previous Rule 702 stated merely:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Miss. R. Evid.702 (repealed). The comment to the previous rule stated:
It is important to note that Rule 702 does not relax the traditional standards for determining that the witness is indeed qualified to speak an opinion on a matter within his purported field of knowledge. Nor does 702 relax the requirement that the scientific principle from which the expert's opinion is derived "must be sufficiently established to have gained general acceptance in the particular field to which it belongs."
Miss. R. Evid. 702 cmt. (repealed) (quoting Frye v. U.S., 293 Fed. 1013, 1014 (1923)). In determining whether a field of knowledge had gained "general acceptance," the test our courts previously adopted was:
Is the field of expertise one in which it has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion? Where the answer to this question is in the affirmative, we generally will allow expert testimony.
House v. State, 445 So.2d 815, 822 (1984). In addition, "The facts upon which the expert bases his opinion or conclusion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture." Hickox v. Holleman, 502 So.2d 626, 638 (Miss.1987).
¶ 38. Neither party has addressed the issue of which version of Rule 702 should apply. IP has quoted only the current Rule 702, which was not effective at the time of this trial. Townsend cites the old Rule 702, but also refers to the new rule and the Daubert test, apparently taking the stance that Johnson was qualified to testify as an expert under either the old or the new standard.
¶ 39. "The qualification of an expert witness is left to the sound discretion of the trial judge, and his determination will not be reversed unless it clearly appears that the witness was not qualified." General Motors Corp. v. Pegues, 738 So.2d 746, 752(¶ 14) (Miss.Ct.App.1999) (citing Wilson v. State, 574 So.2d 1324, 1334 (Miss.1990); Smith v. State, 530 So.2d 155, 162 (Miss.1988)). Even before the amendment to Rule 702, however, the Mississippi Supreme Court recognized that "under the guidelines of the Mississippi Rules of Evidence Rule 702, the trial judge serves as `a gatekeeper' in ruling on the admissibility of expert testimony." APAC-Mississippi, Inc. v. Goodman, 803 So.2d 1177, 1185(¶ 30) (Miss.2002). Thus, the sufficiency of foundational facts or evidence on which an expert bases his opinion is a question of law which must be determined by the trial judge. Janssen Pharmaceutica v. Bailey, 878 So.2d 31, 60 (¶ 135) (citing Gulf Ins. Co. v. Provine, 321 So.2d 311, 314 (Miss.1975)). "These facts must afford a `reasonably accurate basis' for the expert's conclusion." Id. (citing Provine, 321 So.2d at 314). Therefore, our courts have held that the trial judge, as the gatekeeper, is required to examine the reliability of expert testimony. See Bailey, 878 So.2d at 60 (¶ 135).
*759 ¶ 40. We examine the trial court's acceptance of Johnson as an expert witness under the Frye standard. We find that the trial court abused its discretion in finding that Johnson was qualified as an expert for two reasons: first, the trial judge did not allow voir dire of Johnson which would have gone directly to the issue of Johnson's qualifications under the Frye standard; second, testimony adduced at trial following Johnson's acceptance by the trial court showed that Johnson clearly was not qualified to testify in his purported field of knowledge. Furthermore, we find that the "foundational facts" on which Johnson based his testimony are insufficient as a matter of law, and that the facts he relied upon did not establish a reasonably accurate basis for his conclusions. The trial judge's decision to accept Johnson as a qualified expert witness amounted to an abuse of discretion, and therefore IP would be entitled to a new trial on this issue.
¶ 41. We first examine voir dire of Johnson by counsel for IP, during which the following exchange occurred:
Q. You remember telling us at a deposition that you did not feel that you were better qualified than Mr. Townsend on these issues, correct?
MR. STAMPS: Your Honor, I object to this. This is not proper voir dire, whether  he's got to test his qualifications right now.
MR. ROZIER: And that would be one way, Your Honor; how much more does he know than the plaintiff?
THE COURT: I'll sustain the objection.
Later, counsel for IP asked:
Q. All right. What standard things, what base things in your area of expertise are you supposed to review before you're able to give a correct opinion? Is there a checklist of sorts?
A. I didn't have a checklist.
Q. Okay. So you're unaware of any standards that your area that you're here to talk about, that community of professionals, requires you to go through so that your opinion is reliable, correct?
MR. STAMPS: I object to that question. It's improper voir dire.
MR. ROZIER: It's  the rule requires, Your Honor 
THE COURT: I'll sustain the objection.
¶ 42. Under former Rule 702, the question to be determined by the trial judge, in his capacity as gatekeeper, was whether Johnson's opinion was "sufficiently established to have gained general acceptance in the particular field to which it belongs." In order to do so, the question to be asked was whether the field of expertise claimed by Johnson was one in which it has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion. Miss. R. Evid. 702 (repealed). Furthermore, the trial judge was required to examine the reliability of Johnson's proposed testimony. We find that the questions posed to Johnson, and disallowed by the trial court, went directly to the issue of whether Johnson was qualified to testify in the field of expertise he claimed: woodyard loading and unloading, and woodyard safety. Johnson's knowledge of any standards in place in his purported area of expertise goes directly to whether there are "techniques and practices" that are generally accepted in his purported field, and whether he has any knowledge whatsoever of those techniques and practices. "[I]f a particular expert's methods ignore or conflict with the `techniques and practices *760 generally accepted within the field,' that expert's opinion should not be considered valid or competent for admission in court." Bailey, 878 So.2d at 60 (¶ 136) (Miss.2004) (quoting T.K. Stanley, Inc. v. Cason, 614 So.2d 942, 951 (Miss.1992)). The trial court should have allowed the defendants to question whether Johnson's testimony conflicted with the techniques and practices of his purported field. At the very least the trial court should have allowed the defendants to question Johnson as to what those techniques and practices actually were. The trial court also should have allowed the defendants to question Townsend as to the standards of which he was aware in his purported fields of expertise.
¶ 43. The trial court's failure to allow more extensive voir dire of Johnson as to his qualifications made it impossible for the court to determine whether Johnson was truly qualified in his purported field. Although these questions were later answered, for the most part, on direct and cross-examination of Johnson during trial, we find that, because the trial judge performs a gatekeeping function, the proper arena in which to discuss these issues was voir dire. We therefore find that the trial court abused its discretion in failing to allow these questions as to Johnson's qualifications.
¶ 44. Notwithstanding our decision that the trial court erred by not allowing proper voir dire of Johnson, Johnson's later testimony at trial clearly showed that he was unqualified. Johnson's testimony included:
Q. Do you consider yourself an expert in the Federal Motor Safety Carrier Regulations by any means?
A. No, I do not.
Q. Okay. Do you read these  those on a regular basis?
A. No.
And, on cross-examination:
Q. You've already told us that you don't consider yourself to be better qualified or a better woodsman than Mr. Townsend; is that not right?
A. He have a number of years of experience in the woods, as well, sir, as I.
¶ 45. Johnson was unqualified to offer expert testimony as to the condition of IP's road. During voir dire, Johnson was asked the following questions:
Q. And you have not been on the Natchez wood yard since before  before this accident?
A. True.
Q. So you don't know of its condition even on the date of this accident, correct?
A. I don't know of the condition at the accident. That's true.
¶ 46. On direct examination, counsel for Townsend asked Johnson to offer his opinion on the condition of the IP road on the day of Townsend's injury, based on the opinion given by Townsend earlier in the trial. Johnson stated that he had been sitting in the courtroom during Townsend's testimony. He equated Townsend's testimony describing the IP premises with his own previous visit to the IP premises, and stated that the condition of the IP road at the undetermined time he visited was "poorly." On this foundation, he stated his opinion that the condition of the IP road "could cause some shifting." He also testified that a properly loaded and bound load would not shift to an unsafe degree. Because Johnson could not identify any sort of standard on which he based his expert opinion, we find that he was unqualified to examine Townsend's testimony and offer his opinion as to whether the conditions described by Townsend caused Townsend's load to shift. Furthermore, *761 Townsend clearly had insufficient facts on which to base his opinion. He admitted that he had not been on the IP woodyard on the day in question. In fact, he couldn't remember the last time he had been there. "The sufficiency of foundational facts or evidence on which to base an opinion is a matter of law. These facts must afford a `reasonably accurate basis' for the expert's conclusion." Bailey, 878 So.2d at 60 (¶ 135) (citing Gulf Ins. Co. v. Provine, 321 So.2d 311, 314 (Miss.1975)). "The facts upon which the expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture." Id. (citing Watkins v. U-Haul Int'l, Inc., 770 So.2d 970, 974 (¶ 11) (Miss.Ct.App.2000)). Without a doubt, Johnson's statement that the condition of the IP woodyard, of which he knew nothing about, could cause shifting, was "mere guess or conjecture." As such, Johnson should not have been allowed to testify as to the condition of the IP road and any proximate relationship between the road and Townsend's accident.
¶ 47. Johnson was also unqualified to testify as to the duty of IP to provide an unbinding rack. Although he testified emphatically that an unbinding rack would have caught the log that injured Townsend, he was at a loss to explain exactly how an unbinding rack would have accomplished this feat, other than the fact that it had "arms" that would catch the log. He admitted that the primary purpose of an unbinding rack was to catch logs that were loaded over the top of the standards, however, he stated that the log which injured Townsend likely fell from the top of the load, but that the log nevertheless was loaded below the standards. He later admitted that the log may have fallen from further down the side of the load, or may have fallen from the top. He was unable to describe how far down the arms of an unbinding rack reached, and therefore was unable to describe how the unbinding rack could catch logs that fell from the load below the arms. He admitted that the unbinding rack would not catch every log that fell off of a trailer. In addition, he did not know when unbinding racks were invented and came into use; he admitted that the majority of woodyards in Mississippi do not maintain unbinding racks on their premises; he stated that he was unaware of any rule which required woodyards to maintain an unbinding rack; that he did not know how high off the ground an unbinding rack stood; he was unaware of the dimensions of an unbinding rack; and he had no pictures or diagrams of an unbinding rack. In fact, Johnson's entire knowledge regarding unbinding racks was summed up quite succinctly in his statement that, "I haven't went around and read no rules, but I feel like it's a safe product that each mill should be introduced to."
¶ 48. This being the case, his testimony that an unbinding rack would have caught the log that injured Townsend was purely unsupported speculation. Johnson's opinion regarding the unbinding rack was based on no standards that he was aware of, and the facts on which he based his opinion were insufficient for him to reach the conclusion at which he arrived. The trial court, in its position as gatekeeper, should have found that Johnson was unqualified to offer testimony as to IP's liability for failure to maintain an unbinding rack on its premises. Accordingly, IP would be entitled to a new trial on these issues.
B. The trial court erred in failing to permit IP to cross-examine Johnson as to his misdemeanor convictions for lack of safety.
¶ 49. On the day of trial, Townsend filed a motion in limine which asked *762 the court to bar "any testimony regarding Mr. Royal Johnson's driving record." This motion was granted on the basis of Mississippi Rule of Evidence 609. IP argues that "Royal Johnson was thus allowed to testify as an expert on safety opining that IP was unsafe in its practice; while simultaneously precluding IP from cross-examining Royal Johnson on his own personal record of safety directly relating to his alleged area of expertise." We agree and find that the trial court's decision to grant this motion in limine would entitle IP to a new trial.
¶ 50. The misdemeanor violations sought to be introduced by the defendants at trial were as follows: 1) convicted of operating an oversized vehicle in December, 1996; 2) convicted of operating with improper equipment in 1997; 3) speeding ticket in April, 1997; 4) convicted of operating an oversized vehicle in 1998; 5) speeding ticket in June, 1999; 6) driving with an expired tag in October, 2000; and 7) speeding ticket in December, 2000. Royal Johnson was proffered by Townsend as a safety expert on the basis that he had been "loading and unloading trucks for three years and driving trucks for a number of years."
¶ 51. Clearly the trial court erred in excluding these misdemeanor convictions pursuant to Rule 609. Rule 609 regards testimony admitted "[f]or the purpose of attacking the credibility of a witness." IP correctly points out that the misdemeanors in question go to the qualifications of Johnson as a safety expert, and not to his credibility. These misdemeanors would do nothing to prove that Johnson was somehow lying about the issues to which he testified, such as short-loading, and the use of unbinding racks. Rather, these misdemeanors go to Johnson's record of safety, and his qualifications as an expert in his purported fields of safety. If Johnson was proffered as an expert on the basis that he had been "driving trucks for a number of years," then the jury should have been allowed to hear testimony elicited on cross-examination regarding his record of driving trucks during that period of time.
¶ 52. The trial court erred in excluding evidence relating to Royal Johnson's qualifications under Rule 609, and IP would be entitled to a new trial on this basis.
III. WHETHER THE TRIAL COURT ERRED IN FAILING TO ALLOW APPORTIONMENT TO OTHER PARTIES.
¶ 53. IP argues that the trial court erred by failing to allow a proposed jury instruction, D-IP-15, which would have allowed the jury to apportion fault not only between Cain Logging and IP, but among TDC Logging and Kenneth Townsend Logging as well. TDC, according to the undisputed testimony at trial, loaded additional logs onto the top of Townsend's load. According to IP, "[i]f the top logs were not properly loaded, it was certainly more reasonable for the jury to infer that there was negligence by Terry Dean Cain Logging than it was for the jury to infer that anything IP did caused or contributed to the accident."
¶ 54. The instruction granted by the trial court, D-IP-15A, allowed apportionment between IP, Cain Logging, and Townsend. In a separate instruction, P-19, the court instructed the jury that "the negligence of the loader is imputed to and thus becomes the negligence of the Defendant, Cain and Cain Logging, Inc." In a written opinion denying the defendants' motion for a new trial, the trial court found that a jury instruction allowing apportionment to TDC Logging was properly disallowed because TDC and Cain Logging were in a joint venture as a matter of law. As to Kenneth Townsend Logging, the *763 trial judge ruled that liability could not be apportioned because the defendants had not made out a prima facie claim of negligence against Townsend Logging.
¶ 55. While Cain Logging, which is no longer a party to this appeal, made a substantial argument that the issue of whether a joint venture existed should have been submitted to a jury, and therefore that the acts of TDC Logging in loading Townsend's truck should not automatically have been imputed to Cain Logging, we find that the jury instructions as to apportionment did not prejudice IP. The jury was clearly instructed to hold Cain Logging liable for all of the acts involved in loading Townsend's truck; these acts would have included those of TDC Logging. Thus, the jury's apportionment of fault already incorporated an apportionment of fault as to the aspect of loading. Allowing an apportionment as between Cain Logging and TDC Logging would have only affected the allocation of the forty-two percent of liability apportioned to Cain, not the forty-eight percent apportioned to IP. We find that any error of the trial court with regard to apportionment to TDC Logging did not prejudice IP.
¶ 56. Further, we agree with the trial court that insufficient facts were presented at trial to make out a prima facie case of negligence against Kenneth Townsend. Similar to the proof Townsend submitted regarding an unbinding rack, the evidence submitted regarding a defective front binder and use of a four-bolster trailer was insufficient to establish a duty on the part of Kenneth Townsend Logging. The trial court did not err in refusing to allow apportionment to Kenneth Townsend Logging.
¶ 57. THE JUDGMENT OF THE CIRCUIT COURT OF SHARKEY COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, ISHEE AND ROBERTS, JJ., CONCUR. IRVING AND CHANDLER, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., NOT PARTICIPATING.
NOTES
[1] Townsend's original lawsuit was filed against both IP and Cain & Cain Logging, Inc. ("Cain Logging"). Although Cain Logging was initially a party to this appeal, it settled with Townsend subsequent to oral argument, and we granted a motion filed by Townsend to dismiss Cain Logging from the appeal. IP is now the only party appellant.
[2] The distance between the tract in Rolling Fork and the IP woodyard was approximately 100 miles.
[3] Logging trailers have either two or four "standards," "stakes," or "bolsters" on either side of the trailer. The purpose of the standards is to retain logs on the trailer and prevent them from falling off the sides of the trailer. The terms "standards," "stakes," and "bolsters" were used interchangeably below, and we use the terms interchangeably here.
[4] At trial, Johnson's expert, Royal Johnson, discussed infra, agreed that IP employees did not direct the hauler, instruct him on how to perform his job, or otherwise control him in any way between the entrance gate and the unloading area.
[5] Townsend admitted that he had taken loads to the woodyard on over 100 previous occasions and that he was familiar with the procedures at the woodyard. Townsend agreed that the procedure employed by the woodyard was uniform throughout that time period, and that it was applied uniformly to all vehicles that came to the woodyard.
[6] In his deposition, Townsend admitted that he did not look up at the load before releasing the binder. At trial, he attempted to reform his testimony, indicating "I might not have looked up or glanced up well enough, but it's a possibility I looked up." Townsend could not recall whether the log fell from the top of the trailer, or off of the side. Townsend's expert was of the opinion that the log fell from the top of the trailer; however, he was unable to explain the basis on which he rested this belief.
[7] At trial, Townsend testified that he continued to suffer pain from his injuries, and that he was no longer was able to participate in activities he had previously enjoyed, such as hunting.
[8] Townsend's claim against Cain Logging was that Cain Logging negligently "short-loaded" his trailer (did not load the logs far enough from the standards to prevent the load from shifting to an unsafe degree), thereby proximately causing Townsend's injuries.
[9] Townsend testified that, if a trucker was turned away by the scaler, there was a woodyard across the street where, for a fee, the unacceptable load could be trimmed of protruding limbs and branches and brought up to IP's quality standard. In his brief, Townsend asserts that this separate woodyard is operated by IP. However, the undisputed facts at trial indicate that this separate woodyard is a completely independent operation.
[10] When asked, at trial, why he could so readily see from a picture that the logs on his trailer were short-loaded, but could not make the same observation on the day that he was injured, Townsend replied, "I can't answer that."
[11] Townsend stated that the IP scaler had superior knowledge of any defect on Townsend's truck because of a television camera in the scaler's house, which could see a branch as small as his finger. According to Townsend, this television camera allowed the scaler to examine the top of loads that came into the IP woodyard. However, Townsend also testified that it was the duty of the truck driver to check his own load, and that to accomplish this, the truck driver is required to step back from his load and examine the logs on the top of the load. Thus, Townsend admitted that he could have performed the very inspection that he was alleging the scaler failed to perform. Furthermore, the testimony only established that the scaler was required to check for logs loaded above the standards, loads with excessive branches, and/or loads that were not bound. Townsend himself offered no testimony that the scaler was required to check for short-loaded logs.
[12] No testimony was elicited at trial which tended to prove that the scaler was required to check for logs that had been short-loaded. The closest testimony for imposing such a duty was elicited on cross-examination of Craig Beals, who agreed that, in his opinion, a log loaded "behind the standard" is not secure. He immediately qualified this statement, however, by noting that he did not know whether it was the duty of the scaler to examine loads for short-loaded logs. Accordingly, Beals's testimony cannot be read as establishing a duty on the part of the scaler to check for short-loaded logs, without being taken out of context.
[13] He also testified that, if Townsend had been supplied with a four-bolster trailer by his employer, the four-bolster trailer would have prevented the log from falling.
[14] The other issues include 1) that the trial court erred in denying IP's motion in limine to prohibit evidence of use of unbinding racks at other facilities, 2) that the trial court submitted erroneous instructions to the jury, and 3) that the jury verdict was excessive and IP should be granted a new trial and/or remittitur. We find that these issues are moot in light of our decision to grant judgment as a matter of law in favor of IP.
[15] The agreed order stated that it was "subject to all discovery being completed by the parties, with the understanding that all counsel shall make diligent efforts to complete discovery prior to that time." On motion for reconsideration, counsel for IP informed the court that at the time the defendants agreed to the trial setting, counsel for Townsend had represented to counsel for Cain Logging that there would be no expert proffered on the issue of liability. The record does not reflect that counsel for Townsend made any attempt to rebut this assertion.
[16] There was some confusion over the date on which Johnson had been made available for deposition. At the previous hearing on the motion for continuance, held on April 8, counsel for Townsend had indicated that Johnson would be available for deposition one week later on April 15, 2003, the same day as Townsend. The defendants objected to this date because Townsend had not yet submitted the Rule 26(b)(4) interrogatory responses for Johnson and because the offer made at the April 8 hearing was the first the defendants knew of the proposed expert deposition on April 15. Also on April 8, counsel for Townsend faxed to the defendants a letter which stated "our expert, Mr. Royal Johnson, will be available to be deposed on May 15, 2003, after the conclusion of Mr. Townsend's deposition." (Emphasis added). Counsel for the defendants possibly could have inferred from the letter, despite the typographical error, that Johnson was available for deposition on April 15, since that was the date that Townsend's deposition was scheduled. Nevertheless, the mistake in the letter was by Townsend's counsel, and not by the defendants.
[17] We note that this one day continuation was granted only one week before trial.
[18] At the May 12 hearing, counsel for Townsend acknowledged that while the expert interrogatory response had been supplemented two weeks earlier to include Johnson's qualifications and experience, it had not been supplemented to include the substance of his proposed opinions.